**James PECK, Plaintiff,**

v.

**UNITED STATES of America et al., Defendants.**

**76 Civ. 983 (CES).**

United States District Court,
S. D. New York.

May 1, 1981.

Reargument Granted in Part and
Denied in Part
Aug. 17, 1981.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for plaintiff; Edward Copeland, Eric M. Lieberman, New York City, Lewis A. Kornhauser, N. Y. Univ. School of Law, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., for defendants; Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff James Peck brought suit for damages allegedly resulting from a May 14, 1961 assault that occurred shortly after Peck arrived in Birmingham, Alabama on a "Freedom Ride" to challenge segregation in public facilities used in interstate transportation. We have held that Peck stated a cause of action under 42 U.S.C. § 1986 (1976) against six agents of the Federal Bureau of Investigation ("FBI" or "Bureau") and the United States. *Peck v. United States*, 470 F.Supp. 1003, 1020 (S.D. N.Y.1979).

Currently at issue is plaintiff's renewed request for disclosure of the Task Force Report on Gary Thomas Rowe, Jr. ("Rowe Report"), prepared by the Office of Professional Responsibility of the United States Department of Justice. Defendant claims that the official information privilege insulates the Rowe Report from disclosure. The official information privilege is intended to promote the exchange of "advice, recommendations, opinions and other material reflecting deliberative or policy making processes." *Peck v. United States*, 88 F.R.D. 65, 69 (S.D.N.Y.1980). *See Environmental Protection Agency v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973); *In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577, 580–81 (E.D.N.Y.1979). After *in camera* inspection, our prior decision determined that the report contained both privileged communications and unprivileged factual matter. *Accord, Playboy Enterprises, Inc. v. United States*, No. 80–1172, slip. op. at 7–12 (D.D.C. March 31, 1981). We denied disclosure of the unprivileged portion of the report, based upon plaintiff's slight need and the tentative status of the Rowe Report. *Peck v. United States*, 88 F.R.D. at 74.

Plaintiff contends that release of the "Summary of Results of the Department of Justice Task Force Investigation on Gary Thomas Rowe, Jr." ("Summary") waives the qualified privilege for official

information and requires disclosure of the Rowe Report. Voluntary disclosure of a significant part of the privileged communications may waive the privilege. *See* Proposed Fed.R.Evid. 511; *North Dakota ex rel. Olson v. Andrus*, 581 F.2d 177, 180 (8th Cir. 1978) (waiver of FOIA exemption for intra-governmental memoranda, 5 U.S.C. § 552(b)(5) (1976)); *United States v. American Tel. & Tel. Co.*, 86 F.R.D. 603, 637 (D.D.C.1980) (establishing guidelines for resolution of privilege claims); *In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 463 (S.D.N.Y.1973) (attorney client privilege). Alternatively, if a release creates even "an unintended false impression" of the underlying material, the privilege may be waived. *See Moore-McCormack Lines, Inc. v. I.T.O. Corp.*, 508 F.2d 945, 948 (4th Cir. 1974); *In re Franklin National Bank Securities Litigation*, 478 F.Supp. at 585.

We shall first determine whether the Summary revealed a significant portion of the privileged communications. There is one relevant section of the Summary that states opinions or deliberative conclusions of the Task Force.

> ... It appears that one of Rowe's handling agents knew or should have known that Rowe was more deeply involved in the beatings at the Trailways bus station in 1961 than he reported. ... Rowe was repeatedly warned by the FBI not to engage in violence, and was on one occasion threatened with termination as an informant if he did not abandon a Klan position that required that he participate in the planning and direction of violence. In retrospect, the Task Force expressed some concern about the aggressiveness of Rowe's handling agents in apprising themselves of the degree of Rowe's involvement in Klan violence and in their efforts to dissuade him from participating in violence, but the Task Force noted there were a number of records which' show that Rowe's handling agents did question him about his role and did caution him against violence. Finally, there was no evidence that the FBI condoned or encouraged violent acts by Rowe.

This was included in a section of the Summary entitled "Conclusion: Was the FBI's Supervision of Rowe Adequate?" It clearly emphasizes the warnings given to Rowe to avoid violence and represents that the Task Force was concerned about the oversight exercised by Rowe's handling agents, especially regarding the May 14, 1961 incident, but concluded that the FBI did not condone or encourage his violence. These conclusions are analytic, not factual. Thus, the Summary reveals an opinion intended to be used by policy makers to determine whether and to what extent events such as the May 14, 1961 incident can be prevented from recurring.

These opinions and conclusions were responsive to one of the three questions addressed to the Task Force: "whether the FBI's supervision of Rowe as an informant was adequate?" The Task Force answer would seem to be a significant portion of the privileged Rowe Report. But the Summary shows that seven instances of alleged violent conduct were considered by the Task Force in determining the extent of FBI supervision and knowledge of Rowe's activities between 1960 and 1965, and it is unclear from the Summary if the opinion reflects a judgment based upon one, several or all of these instances. Only the question of the FBI's supervision or knowledge of Rowe's conduct as it bears upon the May 14, 1961 incident is at issue in this case. Nonetheless, based upon our *in camera* review of the Rowe Report, we conclude that the May 14, 1961 incident was central to the Task Force's opinion about FBI supervision and knowledge of Rowe's acts. Thus, although the May 14, 1961 incident was not the sole basis for the Task Force's conclusions, the Summary voluntarily revealed a significant portion of the Rowe Report and waived the privilege to some extent.

Even if the Summary did not reveal a significant portion of the privileged matter, there may be differences of view as to the characterization of the inferences or conclusions which might be drawn from the Rowe Report. This is sufficient to require disclosure. *See Moore-McCormack Lines, Inc. v.*

*I.T.O. Corp.*, 508 F.2d at 948–49. *Cf. North Dakota ex rel. Olson v. Andrus*, 581 F.2d at 182 ("selective disclosure" was "intolerable as a matter of policy" under FOIA exemption for intra-governmental memoranda).

In sum, we find that voluntary disclosure of a significant portion of the privileged matter of the Rowe Report in the Summary waived the qualified official information privilege. We conclude that full disclosure of the relevant portions of the Rowe Report is warranted. The following is a list of the relevant pages of the Rowe Report that must be produced:

1. pages 4–6 (to "However, on another occasion . . . .");
2. pages 15 (from "FBI Guidelines") and 16 (to "Cointelpro");
3. pages 30–64;
4. Appendix III, pages 20 (from "b.) Supervision of Informants")–36 (to "Former Agent . . . .");
5. Appendix III, page 42, sentence beginning "Of the nine . . .";
6. Appendix III, pages 44–46 (to footnote 110).

SO ORDERED.