EAGLE–PICHER INDUSTRIES, INC.,
and UNR Industries, Inc., et
al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 170–83C, 16–84C.

United States Claims Court.

Jan. 12, 1987.

---

Joe G. Hollingsworth, Washington, D.C., for plaintiffs UNR Industries, Inc., and UNARCO Industries, Inc.

Linda C. Jamieson, Washington, D.C., with whom were Benjamin A. Dinkins, Kimberly Humes, and Asst. Atty. Gen. Richard K. Willard, for defendant.

## ORDER

NETTESHEIM, Judge.

Plaintiffs UNR Industries, Inc., and UN-ARCO Industries, Inc. ("plaintiffs"), two of

**454**

the plaintiffs in these consolidated cases, have moved for an order compelling answers to their third set of interrogatories and requests for production of documents. Defendant has opposed, and plaintiffs have replied. The comprehensive submissions of the parties have been reviewed, and argument is deemed unnecessary.

### FACTS

Plaintiffs seek documents and other sources of information relating to a written statement and the testimony of Deputy Assistant Attorney General Robert L. Willmore of the United States Department of Justice before the Subcommittee on Labor Standards, Committee on Education and Labor of the House of Representatives. Mr. Willmore appeared before the subcommittee on June 25, 1985, in connection with oversight hearings on "The State of the Asbestos Litigation"; his oral testimony, which incorporated his written statement, was transcribed under the caption "Federal Involvement in Compensating Asbestos-related Disease Victims" and published as *Hearings on Compensation for Occupational Diseases, Hearings Before the Subcomm. on Labor Standards of the House Comm. on Education and Labor*, 99th Cong., 1st Sess. 296 (1985). (Mr. Willmore's testimony is quoted in this order from the transcript used in plaintiffs' interrogatories.) It appears that Mr. Willmore's testimony was requested and that he was not under any compulsion. After Mr. Willmore had presented his status report or overview of the asbestos litigation, including the litigation position taken by the United States, and had presented the Administration's legislative position that the asbestos manufacturers should not be relieved of their responsibility for damages paid and payable to asbestos victims, the following exchange took place:

Mr. MURPHY. Okay. Before you became associated with the Department of Justice, or probably the Administration, in 1978 the Justice Department settled an asbestos lawsuit in Tyler, Texas, by agreeing to pay over $5 million to a group of plaintiffs.

If the government has no liability, why do you suppose the government settled in this regard to award some claimants in Tyler, Texas, an award and yet stand fast on their policy today to deny benefits?

Mr. WILLMORE. Of course, I wasn't at the Department of Justice at the time, and the only information I have is sort of second-hand and third-hand. What led the government to settle in the case has been written about extensively. Even recently in a series of articles in the New Yorker, there has been some discussion of that.

It is my understanding—and, again, I want to emphasize, this is second- and third-hand information—that the Department of Justice consistently asserted that it had no liability in the case both on factual and legal grounds.

It settled the case, however, by and large, because of tremendous pressure that was placed on the government by the judge and by the other parties to join into a settlement, and I think the Department of Justice, or at least the officials of the Department of Justice, made a litigation strategy decision that, given this pressure that they were facing, and given the relatively modest amount of money which was being requested of the government in the case, that they were better off settling out, even though they felt they had no liability, than going to trial, devoting considerable litigation resources, possibly before a very hostile judge, the hostility perhaps the result of the government's failure to settle or enter into the settlement, and then being involved in the litigation which would drag on for years.

I think it was a litigation strategy decision, in other words. I don't think it was a decision having to do with their perception that the government was liable on the facts or the law.

Tr. 16–17. This testimony will be referred to as *Tyler I*. Mr. Murphy thereupon requested records of the "real justification, the factual justification, that the depart-

ment would have given Congress for the settlement of this case." *Id.* at 17. In his submission of October 22, 1985, Mr. Willmore declined to turn over this documentation on the ground that ongoing litigation would be compromised, although he furnished the "Stipulation for Compromise Settlement" in *Tyler I.*

Other *Tyler* cases were discussed by Mr. Willmore, referred to as *Tyler II:*

Mr. MURPHY. In a second Tyler settlement, the government paid no money but agreed to litigate claims for asbestos plaintiffs in an international court, I believe, to bring in South African producers. Why was such a settlement reached a second time if you assert no liability? Do you know?

Mr. WILLMORE. Again, we asserted and continue to assert very strongly that there is no liability. On the other hand, it's a trial. We often enter into, as a matter of litigation strategy, because we have limited resources, we can't try all the cases we're in—we often enter into settlements where we, in effect, can do something that gets us out of the case and where we don't end up conceding liability.

In this case, the other defendants indicated, and the plaintiffs indicated, that if the government would pursue those international claims, because they were having a very hard time pursuing those international claims, and the government had an advantage in that regard, they would not pursue the issue of government liability.

We looked at it, and we decided that that seemed to be, from a litigation strategy standpoint, a fair resolution. It got us out of the case that we have had to devote a lot of resources to for a long time, and that was the reason for the government's decision to go along with that agreement.

*Id.* at 19. Plaintiffs contend that the quoted remarks, and others to similar effect, waived the attorney-client privilege and the immunity of the work product doctrine. Defendant asserts both privileges—primar-

ily the work product doctrine, maintains that no waiver has occurred, and further argues that the discovery requests are overbroad and that compliance therewith would be unduly burdensome.

Insofar as plaintiffs seek documents and other sources of information on most of the statements not relating to the *Tyler* settlements that Mr. Willmore made in writing and in his oral presentation to the subcommittee, the requests are not discussed individually or by category, although defendant's opposition summarizes the topics. If there are distinctions to be drawn among these requests, the opportunity to make them has not been taken. Therefore, the approach to the remaining requests is whether discovery in gross of the non-*Tyler* settlement documents and information should be allowed. Plaintiffs argue that summarizing the Government's litigation position waived any privilege and that many of the documents called for are not attorney-client communications or work product. Defendant resists disclosure primarily based on the work product doctrine and the alleged undue burden that the discovery will impose.

## DISCUSSION

In connection with his appearance before Congress, Mr. Willmore made six types of disclosures: (1) a document, the stipulation of settlement; (2) statements that the Government had not settled the cases for reasons of liability; (3) statements that litigation strategy, apart from considerations of liability, prompted the settlements; (4) statements in the nature of a status report on the litigation involving the asbestos manufacturers and the United States; (5) statements in the nature of an opening statement outlining the Government's litigating position against the asbestos manufacturers, including statements as to what the Government's evidence showed; and (6) statements reflecting the Administration's position on a legislative solution. In turn, two types of discovery are sought by plaintiffs: documents and facts relied on by Mr. Willmore in making his written and oral

statements. The questions to be answered are whether the documents or information are privileged; whether any applicable privilege has been waived; whether plaintiffs have satisfied their burden of proof for release of documents or other recordations subject to the qualified work-product immunity; and whether, in respect of non-privileged documents and information, the discovery is unduly burdensome.

### 1. *Attorney-client communications and work product*

Defendant successfully makes out the basis for the attorney-client privilege and the immunity of the work product doctrine regarding Mr. Willmore's testimony concerning settlement of the *Tyler* litigation and other topics included in the briefing that preceded his testimony.

■ The attorney-client privilege, belonging to the client, encourages complete disclosure of information in the nature of confidential communications by a client to the attorney during the attorney-client relationship. This court adopts the classic formulation of the requisites for the privilege in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass. 1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

(Adopted in, *e.g., Chubb Integrated Systems Ltd. v. National Bank of Washington,* 103 F.R.D. 52, 64 & n. 4 (D.D.C. 1984) (test recognized widely); *Coastal*

*Corp. v. Duncan*, 86 F.R.D. 514, 520–21 (D.Del.1980).) *Coastal Corp.* notes that the privilege extends to legal advice by the attorney, not only confidential communications by the client. *Id.* at 520 n. 3.

The client agency, the Department of Justice, per Mr. Willmore, sought the legal advice of an informed attorney, Peter A. Nowinski, former Director of the Environmental and Occupational Disease Litigation Section, Torts Branch, Civil Division, United States Department of Justice, the section that represents the Government in asbestos litigation. Mr. Willmore says that he imparted in confidence the Administration's concerns to Mr. Nowinski. Affidavit of Robert L. Willmore, Dec. 16, 1986, ¶ 3, and that Mr. Nowinski's advice was the source of his presentation to Congress. *Id.* ¶ 6. Mr. Nowinski says that the advice and information given to Mr. Willmore to assist the latter in preparing his testimony drew on his own and his staff's legal and factual analyses, mental impressions, recommendations, and opinions of issues and knowledge of documents developed in the course of defending the Government's interests in all asbestos litigation over the past several years. Affidavit of Peter A. Nowinski, Dec. 11, 1986, ¶¶ 5–7.

■ It matters not that Mr. Willmore was seeking to develop legislative strategy designed to advance administration policy. The point is that he obtained legal advice in the course of formulating his testimony to advance administration policy. The provision of legal services, *i.e.,* rendering legal advice, is recognized as the basis for the attorney-client privilege, which is not limited to assisting in legal proceedings alone. *Coastal Corp. v. Duncan* cautions only that the burden of persuading the court that the purpose for which advice has been sought is "even more essential when the documents have been generated by the government where many attorneys function primarily as policy-makers rather than lawyers." 86 F.R.D. at 521. The Nowinski affidavit establishes beyond cavil that Mr. Willmore requested legal advice of a litigating attorney who formulated his advice

from his own experience in litigation, that of his staff, and documents relating to the litigation. The briefing that Mr. Willmore received from Mr. Nowinski, and vice versa, were privileged communications. Embraced within this protection are documents developed expressly for the briefing.

■ The work product doctrine, belonging to both attorney and client, complements the attorney-client privilege insofar as protecting the production of an attorney, or those working for him, from the time litigation is anticipated. Created by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the doctrine evolved into a qualified privilege for documents and tangible things in the 1970 amendments to the Federal Rules of Civil Procedure, which added Fed.R. Civ.P. 23(b)(3) (corresponding to RUSCC 26(b)(2)). The policy justification for this qualified privilege is central to trial by adversarial advocacy and has been explained thusly:

> The primary purpose of the work product privilege is to assure that an attorney is not inhibited in his representation of his client by the fear that his files will be open to scrutiny upon demand of an opposing party. Counsel should be allowed to amass data and commit his opinions and thought processes to writing free of the concern that, at some later date, an opposing party may be entitled to secure any relevant work product documents merely on request and use them against his client....

*In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977). The protection accorded work product encourages written materials. If the attorney's thought processes have not been reduced to writing or other tangible form, the immunity does not come into play.

■ The qualified privilege distinguishes sharply between ordinary or fact work product and opinion work product. Fact work product is discoverable upon showings both of substantial need and inability without undue hardship to obtain the substantial equivalent of the materials by other means. RUSCC 26(b)(3); *see Hickman v. Taylor*, 329 U.S. 510–12, 67 S.Ct. at 393–94; *In re Murphy*, 560 F.2d at 334. Discovery of opinion work product—mental impressions, conclusions, opinions, or legal theories—is allowed sparingly. *See Hickman*, 329 U.S. at 513, 67 S.Ct. at 394 ("a rare situation"); *In re Murphy*, 560 F.2d at 336 (citing cases).

■ The work product doctrine is applicable because many of the documents discussed or shown in the Nowinski briefing were derived from on-going and concluded lawsuits involving the same subject matter. The cases cited by plaintiffs for the proposition that work product in or for one case is not work product in another predate the decision in *In re Murphy, id.* at 333–35 & n. 13 (citing cases), canvassing the caselaw and concluding that the weight of modern authority is that the work product immunity applies to documents prepared in anticipation of unrelated terminated litigation. *Accord Panter v. Marshall Field & Co.*, 80 F.R.D. 718, 724 (N.D.Ill. 1978). Although the question is considered still open, *see, e.g., Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 865 (D.C.Cir. 1980), this court follows the majority view because of the important policies discussed by the Eighth Circuit in *In re Murphy* that are especially appropriate since the terminated litigation for which the protection is claimed involves issues closely related to issues in the pending litigation:

> The work product privilege would be attenuated if it were limited to documents that were prepared in the case for which discovery is sought. What is needed, if we are to remain faithful to the articulated policies of *Hickman*, is a perpetual protection for work product, one that extends beyond the termination of the litigation for which the documents were prepared. Any less protection would generate the very evils that the Court in *Hickman* attempted to avoid.

560 F.2d at 334 (footnote omitted).

Defendant takes the position that the documents amassed in defendant's files in preparing for litigation, even though not

themselves generated in anticipation of litigation, are work product. In a case such as this, involving endless documents, it could be said that a party's acuity in compiling its collection from millions of documents deserves some protection. *See Hickman*, 329 U.S. at 511, 67 S.Ct. at 393. The Federal Rules and the rules of this court, however, offer no solace. It is held therefore that the work product immunity applies to those documents that were both included in the Nowinski briefing and were prepared in anticipation of on-going and past-concluded litigation.

### 2. *Requisites for invoking privilege*

█ Plaintiffs say that defendant has failed to sustain its claim to any privilege because in response to the discovery requests it did not provide an adequate privilege log or otherwise adequately identify the documents it seeks to shield from discovery. Defendant's answers to interrogatories dated February 25, 1986, as supplemented by the log provided by letter of October 9, 1986, comply with ¶ 14 of the Stipulations Regarding Document Searches at the Federal Records Centers signed by these plaintiffs on December 5, 1984, insofar as defendant identified some documents, not from Federal Records Centers, that were used in briefing Mr. Willmore. However, defendant was not obligated in response to the discovery requests to provide the elaborate listing for all relevant documents set forth in plaintiffs' instructions. *Cf.* Manual for Complex Litigation 275–76 (5th ed. 1982). Had defendant moved for a protective order, an affidavit attesting to more precise identification of the claimed privileged material would have been required. *E.g., International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 93 (D.Del.1974). A similar showing must be made in resisting a motion to compel on the grounds of privilege. For example, *Coastal Corp. v. Duncan*, 86 F.R.D. at 521, cited by plaintiffs, found insufficient the affidavits and document index provided to the court by a government agency.

In responding to plaintiffs' motion to compel, defendant offers affidavits with only a generalized description of the documents that are responsive to plaintiffs' requests. Mr. Nowinski specifically avers that it would be impossible for anyone to identify all the privileged documents and information that underlay his advice to Mr. Willmore. Nowinski Aff. ¶ 9. Given the size of defendant's document collection, believed by Mr. Nowinski to exceed 100,000 documents in June 1985, *id.* ¶ 6, the averment is credible. Plaintiffs seek every document relating to most of Mr. Willmore's written and oral statements, including the documents that he or his staff reviewed in preparing his testimony. The affidavits submitted by Mr. Willmore and Mr. Nowinski state that Mr. Willmore's knowledge concerning topics within Mr. Nowinski's purview derived from Mr. Nowinski, who, in turn, relied upon his own staff's knowledge of documents that came from many cases arising over the years. In these circumstances to have listed the myriad documents responsive to the interrogatories before coming into court would have amounted to an irresponsible use of litigation resources.

### 3. *Waiver of privilege*

Mr. Willmore opined that the Government entered into settlement of *Tyler I* without conceding liability. He also testified that considerations, other than liability, motivated the decision to settle *Tyler I:* the judge's forcefulness in promoting settlement, the "relatively modest amount of money" that the Government would have to pay ($5.75 million out of $20 million), and the costs of litigating the matter. Regarding *Tyler II*, Mr. Willmore said that liability was contested and that the case settled because the Government had limited litigation resources and because the plaintiffs were willing to drop their cases against the United States if the Government pursued international claims.

Plaintiffs contend that Mr. Willmore gave information that was selectively helpful to the Government and even biased in

its favor. That may well have been the case.[1] Indisputably, Mr. Willmore advanced the Government's interest in the congressional inquiry—to oppose remedial legislation to resolve extrajudicially the nationwide asbestos litigation. From this plaintiffs surmise that the reasons expressed by Mr. Willmore were not the true motivations for the *Tyler* settlements. Plaintiffs suggest that the documents and other information they seek may show that Mr. Willmore dissembled and, on information and belief, they allege that government attorneys authored memoranda that the *Tyler I* litigation should be settled because the Government "faced substantial potential legal liability and ... that the $5.75 million payment therefore would be appropriate and prudent." Plfs' Reply filed Dec. 30, 1986, at 4 n. 4.

▬▬ It is heartening in this complex litigation that common sense can resolve the major issue posed by plaintiffs' motion. One widely utilized and accepted practice in civil litigation is for the party that pays money incident to settlement to preserve non-liability in a stipulation of settlement/dismissal by either expressly not conceding liability or by saying nothing about liability. Were a settling party unable to insulate itself from the implication of liability in other actions, one of the most valuable tools of the justice system would disappear. In this case the stipulation of settlement did not admit liability, and Mr. Willmore's oral testimony was wholly consistent therewith. The attorney-client privilege is waived by voluntary disclosure,

*e.g., Chubb Integrated Systems Ltd. v. National Bank of Washington,* 103 F.R.D. at 63 (citing cases). However, it would be ludicrous to suggest that making public the existence and terms of a stipulation of settlement, which already has been filed in court and is a public document, waives the attorney-client privilege to allow probing for the "real" reasons for settlement. It must be held in these circumstances that disclosure of a decision to settle without admitting liability preserves the confidentiality of the settling party's evaluation of its prospects for success.

▬▬ Similar policy reasons warrant the shield of the attorney-client privilege for Mr. Willmore's disclosures concerning the strategic considerations that played a role in the settlements, as well as his testimony that reflected his own confidential communications to Mr. Nowinski concerning the Administration's concerns in the asbestos litigation or that came to him from Mr. Nowinski's briefing. As defendant points out, the Government did not take occasion from the testimony of industry representatives in the 1985 congressional inquiry to explore in these cases the facts underlying the positions sponsored by these witnesses. The logical result of granting plaintiffs' motion would be to thwart any input into the legislative process by a government entity charged with defending the United States in on-going litigation during the period when Congress explored non-judicial remedies to the problems addressed by the litigation. To deprive Congress of the valuable tool of testimony by both private

---

1. Defendant has not argued on brief the qualified privilege for official information. Because defendant had noted the privilege in objection to plaintiffs' interrogatories and requests for production, plaintiffs argued that the caselaw requires disclosure if a significant portion of the privileged communication has been disclosed voluntarily or if the released information gives a false impression of the underlying material. *Peck v. United States,* 514 F.Supp. 210, 212 (S.D.N.Y.) (citing cases), *on rehearing,* 522 F.Supp. 245 (S.D.N.Y.1981), *appeal dismissed,* 680 F.2d 9 (2d Cir.1982). The cases in *Peck* treat releases of documents. Here the only document disclosed pertaining to the *Tyler* litigation was the stipulation of settlement in *Tyler I,* which, al-

though it is a public document, cannot be opened up for the purpose of establishing liability in another case based on the policy reasons discussed in this order. Moreover, release was ordered of the compliance officer's full report in *Moore-McCormick Lines, Inc. v. I.T.O. Corp.,* 508 F.2d 945, 948 (4th Cir.1974), primarily because the report reflected observations of the investigator, rather than the deliberative processes of the decision- or policymaker, not because the portion disclosed covered only a part of the investigation and gave a false impression about it. *Accord In re Franklin National Bank Litigation,* 478 F.Supp. 577, 585 (E.D.N.Y.1979) (bank examiner's report contained reportorial and expository, not deliberative, material).

and public parties engaged in the litigation would be a disservice to the legislative process and wed the courts to grinding through litigation while foreclosing the legislature from examining potentially less time-consuming and less costly alternatives. Moreover, the Department of Justice must be free to give to Congress, which appropriates its funds, a generalized accounting of how it conducts the business of defending the Government, including settling cases, without the chilling effect to oversight of governmental operations that would result by opening the doors to discovery. The generalized statements of settlement without admission of liability, of strategic considerations prompting settlement, of the status of the litigation, of the Government's litigation position, and of the Administration's position on the issues as a matter of policy do not invite dissection in court. Consequently, the attorney-client privilege bars further disclosure of confidential communications imparted to Mr. Willmore by Mr. Nowinski, and vice versa.

Hindsight instructs that Mr. Willmore could have been more circumspect—and Congress, left less informed—had he not discussed the considerations prompting the *Tyler* settlements or commented on the Government's evidence or given a partisan's report on the litigation. Therefore, it is necessary to decide whether, assuming that the court should have ruled that Mr. Willmore waived the attorney-client privilege on these subjects by testifying without compulsion about them, the work product protection has been waived for documents.

"What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances...." *United States v. Nobles*, 422 U.S. 225, 239 n. 14, 95 S.Ct. 2160, 2171 n. 14, 45 L.Ed.2d 141 (1975). The types of waiver pertinent to this case are implied waiver and disclosure. The former, urged by plaintiffs, permits courts to delimit claims for the protection to purposes reasonably consistent with the purposes for which the work product doctrine was created. *In re Sealed Case*, 676 F.2d 793, 817 (D.C.Cir.1982). The client in that case had allowed the SEC access to all the documents covered by its investigation. The court held that undisclosed documents impeaching the veracity of the material that had been disclosed voluntarily, although the client had succeeded in hiding from the SEC crucial documents (that were not connected with the reasons why a case was settled), were not to be denied to a grand jury investigating crimes uncovered by the SEC's investigation. To do so, the D.C.Circuit reasoned, would be inconsistent with the purposes of the protection. *In re Subpoenas Duces Tecum*, 738 F.2d 1367 (D.C.Cir.1984), extended the result to litigation between private litigants for documents that had been disclosed previously to the SEC.

■ In the cases at bar, the proponents of discovery in subsequent related litigation against the settling party have averred on information or belief that documents exist wherein attorneys for the party resisting discovery advised in the concluded litigation that the Government would be found liable.[2] The court reasons that the purposes for which work product is protected are not disserved by allowing a party publicly, even before Congress, to save face in describing why it settled a case. Rather, it would be contrary to the work product protection for a party to be required to disclose its worst case scenario on liability, even if it could be ascertained that other considerations did not play a role in the settlement decision. The result would

---

**2.** The work product doctrine is not recognized if the work was performed in furtherance of a crime or fraud. For example, the hapless attorney in *In re Doe*, 662 F.2d 1073 (4th Cir.1981), turned over to his client his notes showing that the attorney suborned perjury, and the client released the notes to a grand jury. It was decided based precisely on what had been disclosed that the privilege was inapplicable. Plaintiffs cannot avoid the protection by alleging on information and belief that Mr. Willmore misspoke, whether deliberately or not. What was disclosed to Congress was regular on its face. Moreover, the court will not inspect *in camera* defendant's settlement memoranda to see whether they state that liability prompted settlement. A fraud or crime would not be made out.

be to deprive a client of the attorney's full, fair, and critical written analysis of the consequences of continuing to prosecute or defend cases.

Secondly, disclosures that are " 'inconsistent with the adversary system' " waive the protection of the work product rule. *Chubb Intregrated Systems Ltd.*, 103 F.R.D. at 63 (quoting *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir.1981)). The type of disclosure that will work a waiver typically is made to an adversary. For example, it has been held that disclosing the " 'gist' " of a document, *Chubb*, 103 F.R.D. at 63 (quoting *Malco Mfg. Co. v. Elco Corp.*, 307 F.Supp. 1177 (E.D.Pa.1969)), or a "significant part" of a privileged communication, *Peck v. United States*, 514 F.Supp. at 212, constitute disclosure that may waive the protection. In the circumstances presented, Mr. Willmore disgorged one public document but not the gist or significant part of any other writing. This conclusion need not be arrived at by *in camera* review of defendant's document collection; rather, it follows from the general, summary remarks of Mr. Willmore on all the points in his testimony. Put another way, if potentially thousands of documents need be reviewed to determine if the gist or a significant part of documents were revealed, any disclosure is nonspecific. It is held therefore that the work product immunity has not been waived.

4. *Showings for disclosure of work product*

The work product doctrine protects only tangible things, not communications. It is the scope of that protection which is considered next.

Nothing undermines Mr. Nowinski's averment that he briefed Mr. Willmore based on his opinions that were derived through his supervisory responsibility for representing the Government's inter-

ests in the asbestos litigation. Mr. Nowinski's and his staff's written opinion briefing is protected work product, and protection for the identity of the documents that he or his staff selected from the Department of Justice's collection for Mr. Willmore's review or briefing also is recognized. *Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Were it otherwise, the attorney's mental processes and preparation of the case would be compromised. The list of documents selected may be privileged, but the documents themselves can be discovered.

Upon a proper showing, attorney documents responsive to the discovery requests that were prepared in anticipation of litigation are discoverable, whether or not they were part of the Nowinski briefing. Regarding ordinary or fact work product, plaintiffs must make the showings required by RUSCC 26(b)(2) that a substantial need exists for the materials in preparation of their case and that they cannot obtain the substantial equivalent elsewhere without undue hardship. Even assuming that plaintiffs showed the requisite need for some of the types of documents they seek, they cannot be relieved from failure to make their own document search at the Federal Records Centers, several of which they did not visit, to lay the basis for a finding that the Government obtained the documents called for from sources unavailable to plaintiffs.[3]

Plaintiffs have made no showing to compel disclosure of documents embodying opinion work product, especially those discussing settlement considerations. The same policies supporting a conclusion that defendant has not disclosed work product in a manner inconsistent with the adversary system commend that the documents reflecting opinion work product be accorded the high protection envisaged by *Hickman* and RUSCC 23(b)(2).

---

3. At this late date, the court will not revisit the discovery procedures in effect for over two years whereby all parties were to make their own searches in designated Federal Records Centers. *See* Order entered on November 28, 1984. Moreover, it is too late to entertain a new motion making the showings required by RUSCC 26(b)(2).

5. *Documents that are not protected and discoverable facts*

There are many documents that have nothing to do with Mr. Willmore's confidential communications to Mr. Nowinski or the latter's briefing of Mr. Willmore. These are documents responsive to the discovery requests (1) that Mr. Nowinski did not rely upon for his advice or show Mr. Willmore and (2) that were not prepared in anticipation of litigation by or for an attorney, even though they may have been collected for purposes of this litigation or past-concluded litigation.

■ The Order for Coordinated Records Centers Search entered in these cases on November 28, 1984, obligates the Government, *inter alia,* to make available all non-privileged asbestos-related documents in its or its counsel's possession at that time (¶ 9); to make available microfilm already made of 1,000,000 non-privileged documents and other non-privileged documents from Department of Justice files (¶ 10); to agree to "reasonable, discrete discovery requests for specific documents or information contained in its document collections" (¶ 11); and, in response to future discovery requests, to respond to "narrow follow-on document requests (*e.g.,* to locate specific documents identified in other documents)." *Id.* Plaintiffs have not showed that the Government failed to comply with the November 28, 1984 order. In addition, the requests concerning Mr. Willmore's testimony calling for non-privileged records are not reasonable or discrete in that they seek potentially defendant's entire non-privileged collection. These requests also cannot be characterized as narrow follow-on document requests, since Mr. Willmore's written and oral testimony did not identify documents other than the stipulation of settlement. The requests also call for documents that plaintiffs already had an opportunity to examine, *see* order entered Nov. 28, 1984, ¶ 11, and Mr. Willmore's testimony is not a source of new information or a development that would trigger reopening the Federal Records Centers.

*See id.* Plaintiffs' requests for these documents therefore are denied as unduly burdensome.

■ Plaintiffs are correct that the discovery requests call for facts, and facts are discoverable under the attorney-client privilege and the work product doctrine. *Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981) (citing cases). Thus, the attorney-client privilege does not permit the client to husband facts just because they are communicated to counsel, or vice versa; nor does the work product doctrine excuse discovery of facts, as opposed to the documents or other recordations of those facts. *Hickman,* 329 U.S. at 511–12, 67 S.Ct. at 393–94; *In re Murphy,* 560 F.2d at 334; Fed.R.Civ.P. 26(b)(3) advisory committee notes, 48 F.R.D. 487, 502 (1970) (discussing utilization of Fed.R.Civ.P. 33 and 36 to obtain fact answers when documents protected from request under Rule 30).

■ Authority exists, in this court's view soundly reasoned, that interrogatories cannot be a back door to opinion work product. *See Besly-Wells Corp. v. Balax, Inc.,* 43 F.R.D. 368 (E.D.Wisc.1968) (privilege barred answer to interrogatory asking for efforts to locate witnesses, as opposed to names of witnesses). Any subject concerning the asbestos litigation included in Mr. Nowinski's briefing that emanated from a document prepared in anticipation of litigation, and Mr. Nowinski says that his briefing consisted of such documents, cannot be probed for facts that reveal opinion work product by use of interrogatories. Finally, the court has reviewed the interrogatories and concludes that the facts sought by way of interrogatories that were not matters of attorney opinion in the Willmore testimony and Nowinski briefing would require the same wide-ranging search through defendant's collection and business records previously made available that renders the requests for nonprivileged documents unduly burdensome.

## CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

1. Plaintiffs' motion to compel is denied.

2. Pursuant to RUSCC 37(a)(4), the court deems the making an award of reasonable expenses unjust due to the complexity of the issues involved.