Cathy CARR, Plaintiff,

v.

**C.R. BARD, INC., et al., Defendants.**

**No. 3:13 CV 824.**

United States District Court, N.D. Ohio, Western Division.

Feb. 5, 2014.

See also 290 F.R.D. 615.

Joseph M. Lyon, Lyon Firm, Cincinnati, OH, Troy A. Brenes, Lopez McHugh, Newport Beach, CA, for Plaintiff.

Jennifer J. Hageman, Ulmer & Berne, Cincinnati, OH, Matthew E. Brown, Nelson Mullins Riley & Scarborough, Boston, MA, Matthew B. Lerner, Richard B. North, Jr., Taylor T. Daly, Nelson, Mullins, Riley & Scarborough, Atlanta, GA, for Defendants.

## MEMORANDUM OPINION AND ORDER

JACK ZOUHARY, District Judge.

### INTRODUCTION

Pending before this Court is Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s (collectively "Bard") Motion for Protective Order (Doc. 33), which Plaintiff Cathy Carr ("Carr") opposed (Doc. 34). On February 3, 2014, this Court heard oral argument on the Motion.

This dispute centers on a report, prepared by Dr. John Lehmann, in December 2004 ("the Lehmann Report"). Bard asks this Court to enter a protective order "requiring Plaintiff to destroy the [Lehmann Report] and precluding Plaintiff from using the content of the [Lehmann] Report in the prosecution of her case" (Doc. 33 at 1). Bard asserts the Lehmann Report is work product, and not subject to disclosure in this case.

Two other courts—a California state court ("the *Giordano* Court") and a Nevada federal court ("the *Phillips* Court")—have addressed substantially similar issues as are presented in the pending Motion; each court reached a different conclusion.

## BACKGROUND

Carr filed this action in April 2013, alleging that a Bard medical device—the G2 Filter—which was implanted as a "prophylactic" measure following a car accident, had fractured and became partially "lodged in the space between [her] inferior vena cava and [her] aorta" (Doc. 1 at 1). The G2 Filter is a successor device to the Recovery Filter. And both devices, as agreed at oral argument, differ from an earlier Bard product, the Simon–Nitinol Filter, in that the Recovery and G2 Filters are removable, not permanent (Doc. 35-4 at 9) (explaining, in deposition testimony of a Bard medical director, that the Recovery Filter "could [be] place[d] into a person for short-term needs" as opposed to a "permanent filter" which is "put in for a lifetime of a patient"); (Doc. 21 at 7) (admitting, in Bard's Answer, that the Food & Drug Administration ("FDA") approved the G2 Filter "for optional use as a retrievable inferior vena cava filter").

Bard obtained FDA clearance for the G2 Filter under the "premarket notification process" (Doc. 21 at 7) (admitting, in Bard's Answer, that the G2 Filter obtained premarket clearance), which required a demonstration that the G2 Filter was "substantially equivalent" to some FDA-approved predicate device. *See* 21 U.S.C. § 360c(i) (defining "substantial equivalence" for premarket approval purposes). To win FDA approval of the G2 Filter, Bard identified the Recovery Filter as its predicate device (Doc. 34 at 4; *see also* Hearing Transcript).

Under FDA regulations, Bard must maintain "good manufacturing practice requirements" ("GMPR"), which include a requirement that "medical device manufacturer[ ] establish and maintain procedures for investigating causes of device failure and methods for correcting those problems" (*id.*). *See also* 21 C.F.R. § 820.100(a) (describing a manufacturer's obligation to "establish and maintain procedures for implementing cor-

rective and preventive action"). Bard established procedures for monitoring device failures, including the preparation of a "Remedial Action Plan" ("RAP"), which, in general terms, analyzes the problems posed by a particular Bard device (Doc. 34 at 4.); (*see also* Doc. 35-2) (describing Bard's RAP framework). Each RAP includes, in turn, a Health Hazard Evaluation ("HHE"), or a "risk/benefit analysis to determine whether . . . Bard should withdraw [a] product [as to which failures may have occurred] from the market" (Doc. 34 at 5); (*see also* Doc. 35-2 at 4) (noting "the assigned Medical Director['s]" responsibility for "providing medical consultation" in developing the plan and "documenting a health hazard evaluation to be included in the Division's proposed action plan").

Bard received its first claim related to alleged Recovery Filter failures in February 2004 (Doc. 33 at 10). *See also Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 671 (D.Nev. 2013). In early November 2004, Bard hired a former Bard Medical Director, Dr. Lehmann (Doc. 34 at 5), to produce a report analyzing Recovery Filter failures, and comparing Recovery Filter failures to competitor devices (Doc. 33-1 at 2–3).

In an affidavit attached to Defendants' Motion, Donna Passero, Assistant General Counsel for Bard, states Dr. Lehmann's engagement was "for the purpose of conducting an independent investigation and [to] draft[ ] a report concerning Bard's Recovery[ ] Filter, which I—in conjunction with Bard's Law Department—requested for the purpose of providing Bard with legal advice" concerning that Filter "and to prepare for and assist with anticipated and ongoing litigation" (*id.* at 2–3). Passero reminded Dr. Lehmann about the litigation-related nature of his report during the engagement (*id.* at 3). The Lehmann Report itself is branded as "Attorney work product" (*see* Doc. 33-2 at 4–5).

There is some dispute as to who received copies of the Lehmann Report, or of reports that discussed or cited to the Lehmann Report, after Dr. Lehmann's December 2004 submission to the Law Department. Eventually though, the Lehmann Report was in-

cluded in a January 2005 RAP "distributed to certain employees at the Bard subdivision" where the Recovery Filter was manufactured, all of whom, Defendants assert, "were senior or high-ranking" Bard employees (Doc. 33 at 3–4); (*see also* Doc. 35–1 at 4–5) (reflecting, on the January 2005 RAP's initial pages, the signatures of a Bard president and four vice presidents, who reviewed the RAP).

In addition, Bard's then-Medical Director, Dr. Ciavarella, testified that he was allowed to use the Lehmann Report at his "discretion" in preparing the January 2005 RAP's HHE (Doc. 34 at 7–8). He testified no Bard employee told him he had to keep the Lehmann Report "secret" because it was prepared in anticipation of litigation (Doc. 35–6 at 6). But later in the same deposition, Dr. Ciavarella partially contradicts that statement-he acknowledged that he knew the Lehmann Report was "confidential" when he received it, and that the Bard Law Department was responsible for retaining Dr. Lehmann for purposes of generating the Lehmann Report (Doc. 33–2 at 3–5). He also testified that he "did [not] know that Dr. Lehmann's Report was going to be utilized in conjunction with the preparation of an HHE on the Recovery [F]ilter" (Doc. 33–2 at 4). Moreover, Dr. Lehmann's legal-consulting engagement continued throughout Spring 2005, when he handled "follow-up items related to and which arose out of the report he submitted" (Doc. 33–1 at 4).

In December 2012, Bard "inadvertently" produced the Lehmann Report in *Giordano* (Doc. 33–3 at 1–5). Bard raised a "clawback request" with respect to the Lehmann Report (*id.*), which counsel in *Giordano*—the same counsel who represent Carr—opposed via motion with the California court. Around the same time, Bard sought, and obtained, a ruling in the *Phillips* Court that the Lehmann Report was work product. *See Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 670–71 (D.Nev.2013). Five days later, the *Giordano* Court rejected Bard's clawback request in a decision that reads, in relevant part and without further explanation: "After consideration of all arguments and evidence, the Court rules that Defendant's clawback re-

quest is denied" (Doc. 34–2 at 2). The Lehmann Report continues to be used at depositions for related cases. Bard represents that it continues to object to this practice (Doc. 33 at 13), while counsel for Carr disputes the vigor of Bard's opposition to the use of the Lehmann Report at depositions.

## DISCUSSION

Carr raises a raft of arguments in support of her view that the Lehmann Report is discoverable despite Bard's work product claims. First, Carr claims the Lehmann Report is not work product, but rather a report generated for business purposes, and that even if the Lehmann Report is work product, she has shown a "substantial need" for the document sufficient to disregard work product protection. Carr also advances a series of waiver arguments, specifically asserting Bard has "impliedly" waived work product protection through its litigation decisions, through "partial disclosure," or through conduct inconsistent with maintaining the work product protection. This Court addresses each argument in turn.

### Work Product

■ Federal Civil Rule Rule 26(b)(3)(A) protects from disclosure "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." The Sixth Circuit has expanded on the Rule's "in anticipation of litigation" language to create a two-part test for identifying work product: "(1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir.2006). Conversely, "a document will not be [work product] if it would have been prepared in substantially the same manner irrespective of the anticipated litigation," as would be the case if a document were generated "pursuant to public requirements unrelated to litigation." *Id.* at 593–594. Bard bears the burden of meeting this "because of" standard. *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir.2009). It

can carry that burden by submitting "specific and detailed evidentiary material" such as "affidavits or similar proof." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 382 (6th Cir.2009). "[A]pplication of the privilege will be rejected where the *only* basis for the claim is an affidavit containing conclusory statements." *Id.* at 381 (quoting *Roxworthy*, 457 F.3d at 597) (emphasis added).

Carr notes that "[t]here can be no dispute that the RAP" was prepared for an ordinary business purpose, and would have been created as it was even in the absence of then-existing claims of Recovery Filter-related injuries (Doc. 34 at 11). Carr then notes that the Lehmann Report was incorporated into the RAP; that Dr. Ciavarella testified his HHE was partly a summary of the Lehmann Report; that Doug Uelmen, Bard's Vice President for Quality Assurance (*id.* at 5), testified "Bard used Dr. Lehmann as a consultant to help determine if and when Bard should have removed the device from the market" (*id.* at 11–12); that Bard asserted the Lehmann Report is a "trade secret" in other proceedings; and that the Lehmann Report was "widely distributed" throughout the company after incorporation into the RAP. In Carr's view, all these factors establish the Lehmann Report's business purpose.

Carr's discussion of the link between the Lehmann Report and the subsequently produced RAP and HHE faces a chronological problem. Specifically, Carr looks at use of the Lehmann Report subsequent to its creation in order to identify the purpose for which it was created. That sort of reasoning might be persuasive in the absence of specific testimony about the reasons for the Lehmann Report's initial creation, offered by the Bard employees responsible for commissioning the Lehmann Report and its author. But such evidence does exist in this case, and provides the most persuasive evidence of the Lehmann Report's genesis. *See In re Prof'ls Direct Ins. Co.*, 578 F.3d at 439 ("If a document is prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection"). *See also Roxworthy*, 457 F.3d at 599 (concluding it was error for a lower court to rely on "a requirement that the primary or sole purpose of the [asserted work product document] be in preparation of litigation" in place of a dual purpose rule).

The Passero Affidavit explains that Dr. Lehmann was retained to aid the Law Department in providing Bard legal advice regarding anticipated and ongoing litigation arising out of allegations of Recovery Filter failures. Were that the only statement Passero made, and the only evidence Bard offered, Bard would fail to carry its burden. *See Biegas*, 573 F.3d at 381. But Passero and Bard offer more. Passero further explains that the Law Department instructed Dr. Lehmann to only share the Lehmann Report or its conclusions with the Law Department, or those Bard employees identified by the Law Department. Passero states that, during the preparation of his Lehmann Report, Dr. Lehmann communicated only with those Bard employees designated by the Law Department (Doc. 33–1 at 2–3). Bard already had received "claims from patients or their lawyers [beginning in February 2004 and continuing through] the remainder of 2004, alleging injuries associated with Bard's Recovery[ ] Filter and demanding compensation" (Doc. 33 at 10).

Moreover, in a portion of Dr. Lehmann's April 2013 deposition taken in *Phillips v. C.R. Bard, Inc.*, 3–12–cv–0344–RCJ–WGC (D.Nev.) (pp. 27–32), and offered by Bard at the recent hearing before this Court, Dr. Lehmann consistently testifies that "Bard asked [him] to do legal consulting for [Bard] in the fall of 2004 . . . regarding advice about potential litigation related to the Recovery Filter." Dr. Lehmann explains that, during 2004, he had another contract with Bard for "general consulting," but that second contract excluded consulting work "in relation to potential litigation" (*id.* at 28), and that the two types of work did not overlap (*id.* at 29–30). He represents that his Recovery Filter assignment "was a very specific one . . . spelled out in [a] contract" he received from Passero (*id.* at 28–29). That the Lehmann Report was subsequently attached to the RAP, or served as source material for Dr. Ciavarella's HHE, does not alter the Lehmann Report's work product quality.

Bard asserts "Mr. Uelmen testified Bard used Dr. Lehmann as a consultant to help determine if and when Bard should have removed the [Recovery Filter] from the market." (Doc. 34 at 11–12); (*see also id.* at 6) (citing to deposition pages *not included in the Record* for the same proposition). But there appears to be no support for that statement in Carr's submitted materials. Uelmen *did* testify that the *Ciavarella's* HHE was "a risk/benefit analysis to determine whether ... [Bard] should take [the Recovery Filter] off the market" (Doc. 35–4 at 8–9). Again, that testimony merely goes to establishing the HHE's business purpose; it does not speak to the purpose for which the Lehmann Report was created.

Carr's arguments regarding the allegedly inconsistent positions Bard has taken with regard to the Lehmann Report in different courts—on the one hand, this Court and the *Phillips* Court, and on the other the *Giordano* Court (in the course of briefing a motion to seal a series of documents, including the Lehmann Report)—is similarly unpersuasive. This matter was discussed at oral argument, and need not be explored further except to note that Bard states it has not sought to argue a position in the *Giordano* Court that is inconsistent with a finding of work product in this Court. Because there are conflicting holdings in different courts, the parties may need to clarify their respective positions when conducting discovery in those different courts.

Finally, Carr argues the Lehmann Report is not work product because it was "widely distributed throughout the company" (Doc. 34 at 12). Carr finds such "wide distribution" based on two facts. First, the RAP (which, again, incorporated the Lehmann Report) states on its "face" that the document "was circulated to at least ten ... employees outside of the law department." Second, "[n]umerous other witnesses would have had access to the document" because it was saved on Bard's "document management system" (*id.* at 6–7).

The Lehmann Report's later distribution to a select group of senior employees is most relevant to the issue of waiver, not whether the Lehmann Report was initially prepared "in anticipation of litigation." This degree of sharing shows the Lehmann Report was subsequently used for a business purpose. It does not persuasively contradict Passero or Dr. Lehmann's explanation of the Lehmann Report's genesis, nor does the placement of the Lehmann Report on Bard's internal file storage system, where it was only *potentially* accessible to some unspecified group of *Bard* employees.

This Court concludes that the Lehmann Report was developed "in anticipation of litigation." Bard has met its burden by presenting credible, persuasive evidence, in the form Passero's Affidavit and Dr. Lehmann's deposition, that the Lehmann Report was contracted for in "subjective anticipation of litigation" related to the Recovery Filter. Because Bard had received claims from patients or their lawyers regarding Recovery Filter failures before the Lehmann Report was commissioned, that subjective anticipation of litigation was "objectively reasonable." *See Roxworthy*, 457 F.3d at 600 (concluding a subjective expectation of litigation was objectively reasonable because the party claiming privilege had shown it "had in mind a specific claim supported by concrete facts which would likely lead to litigation" and that it "faced an actual or a potential claim following an actual event or series of events that reasonably could result in litigation") (internal quotation mark omitted). It is reasonable to conclude those demands for compensation might, as in *Phillips*, result in litigation over alleged Recovery Filter failures. The Lehmann Report is work product. *See Biegas*, 573 F.3d at 382 (concluding, in the context of a motion to compel discovery of alleged work product, the party resisting discovery "fail[ed] to recognize that it first had the burden of showing that the document was" work product by offering no "affidavits, depositions, or equivalent proof" relating to that burden, but instead only a deposition cited to show the moving party did not have a substantial need for the requested discovery).

### Carr's Substantial Need Showing

 Work product materials are not exempt from discovery in all cases. Rather, the Lehmann Report may be produced if it is

otherwise discoverable and Carr "shows that [she] has substantial need for the materials to prepare [her] case and cannot, without undue hardship, obtain [the Lehmann Report's] substantial equivalent by other means." Federal Civil Rule 26(b)(3)(A)(i) and (ii). Thus, Carr must not only show the Lehmann Report is relevant, *Laws v. Stevens Transp., Inc.*, 2013 WL 608046, at *3, 2013 U.S. Dist. LEXIS 22159, at *9 (S.D.Ohio 2013), she also must show the Lehmann Report is sufficiently unique and important, as compared to other possible sources of the same information, to justify overriding work product protection.

Carr has demonstrated that the Lehmann Report, absent the work product protection it enjoys, would be discoverable. Carr explains the Lehmann Report's relevance as going to, among other things, the notice "Bard's quality control and management employees" had of design defects in the Recovery Filter (Doc. 34 at 12). Though Carr's own device, the G2 Filter, was not examined in the Lehmann Report—indeed, according to defense counsel's comments at oral argument, the G2 Filter had not yet been released—it is at least relevant that the G2 Filter's *predecessor* device may have had design flaws. This is so because, as explained above, the G2 Filter was only cleared for sale because Bard was able to show it was "substantially equivalent" to the Recovery Filter. At oral argument, Bard's counsel stated that Bard made modifications to the G2 Filter's design to address the very flaws that produced the sort of failure rates identified in the Lehmann Report. But on the present record this Court cannot say that information about the predicate device's possible design flaws is entirely irrelevant to the amount of care Bard should have exercised in designing the G2 Filter.

Having established the relevance of the Lehmann Report, Carr goes on to assert that "there is no other way for Plaintiff to establish that Bard's quality control and management employees were on notice of design defects in the Recovery Filter" except through production of the Lehmann Report (*id.*). Not so. Carr herself gives special weight to the fact that the Lehmann Report,

unlike the already available RAP and HHE, contains "[c]omparisons between the Recovery Filter and the [Simon–Nitinol Filter that] were based on Bard's own complaint files and sales data," not just the less reliable FDA-assembled MAUDE data (*id.*). But Bard asserts that all the underlying complaint data has been produced or, in the case of the Simon–Nitinol Filter, could be produced. Moreover, Bard argues that Carr could simply depose "quality control and management employees" and appropriately ask about their knowledge of Recovery Filter failure rates (Doc. 33 at 11–12).

Carr does nothing to contradict Bard's claims that, in essence, Carr could use the Lehmann Report's "source" data to generate a similar analysis of Recovery Filter failures. Indeed, Carr appears to concede that possibility (Doc. 34 at 13) ("*Even the most rigorous analysis of the same data by Plaintiff's own experts* will only serve as Plaintiff's conclusions regarding the data") (emphasis added). She nonetheless seeks the Lehmann Report because she believes it will have some greater degree of probative value than Plaintiff-generated evidence on the same point. Understandably, she would rather show the factfinder a document bearing Bard's own fingerprints, describing the Recovery Filter's failure rates, rather than her own report, analyzing the same data. The factfinder might conclude that the Lehmann Report would be a more candid assessment of the Filter, while Carr's own analysis could be affected by some form of bias. That understandable desire for (possibly) more probative evidence than what Carr could generate on her own does not demonstrate substantial need for the Lehmann Report, much less that equivalent evidence could not be generated except with undue hardship. *See Phillips*, 290 F.R.D. at 671. Carr has not overcome Rule 26's work product discovery bar.

**Waiver**

■ Carr's final argument is that even if the Lehmann Report was, at one time, work product that protection has been lost through one of three types of waiver.

First, Carr argues that "implied waiver" (or, as Bard terms it, "at issue waiver" (Doc. 33 at 14)) applies to this case because the

Lehmann Report "directly contradicts" Bard's affirmative defenses: namely, that when Bard learned of the Recovery or G2 Filters' failure rates, it took adequate corrective action; and took reasonable efforts to redesign the Recovery Filter (Doc. 34 at 14).[1] However, it is one thing to argue that a waiver might be appropriate if a party's insistence on work product protection would be "unfair" because of some action that party has taken with respect to the protected material, *see In re Grand Jury Proceedings October 12, 1995,* 78 F.3d 251, 256 (6th Cir.1996), and quite another to argue that work product protection is waived if the protected materials tend to undermine an affirmative defense. *See In re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987) (explaining that implied waiver "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information"). Carr's implied waiver theory appears without basis in the case law—except to the extent one can squeeze such an argument into the capacious term "unfair"—and for good reason. Such a theory would apply in an untold number of cases where attorney or consultant investigation reveals information generally harmful to a party's case, contrary to the Sixth Circuit's view that "[i]mplied waivers are consistently construed narrowly." *In re: Gregory Lott,* 424 F.3d 446, 453 (6th Cir.2005). Carr has pointed to no conduct on Bard's part, related to use of the Lehmann Report, that could be deemed "unfair" for waiver purposes. *See Peck v. United States,* 514 F.Supp. 210, 212–13 (S.D.N.Y.1981) (concluding that a government agency's public release of "a significant portion" of a privileged investigatory document, apparently to justify its actions in supervising an informant, waived privilege). Instead, Bard has simply raised affirmative defenses common in cases of this kind, and has asserted work product protection.

Carr's "voluntary disclosure" argument also must be rejected. As Carr describes the rule, "[v]oluntary disclosure to any *adverse party* waives all claims of work product" (Doc. 34 at 15) (emphasis added), yet she never identifies the "adverse parties" to whom the Lehmann Report was disclosed when it was incorporated into the RAP or discussed by the HHE. Instead, the RAP was shared with senior Bard employees. Carr has produced no other evidence of Bard practices that "posed a substantial danger at the time [of that practice] that the [Lehmann Report] would be disclosed" to potential or actual adversaries. *Samuels v. Mitchell,* 155 F.R.D. 195, 201 (N.D.Cal.1994).

Finally, Carr argues Bard's handling of depositions in related cases constitutes waiver. This argument appears to be grounded in a voluntary disclosure theory. Carr states "Defendants cross-noticed multiple depositions noticed in the *Giordano* case into multiple other cases represented by law firms not [counsel for] a party to *Giordano* ..., and for which [counsel for Carr is not plaintiff's counsel]." The Lehmann Report was offered as an exhibit in these cross-noticed depositions, and other attorneys "were given the right to cross examine." Bard objected to the Lehmann Report's use in these cross-noticed depositions, but it still "allowed the depositions to go forward, ... expos[ing] multiple other lawyers and cases" to the Lehmann Report (Doc. 34 at 16). At oral argument, Carr explained that in the *Giordano* stipulated protective order, the parties agreed that documents produced in *Giordano* could be used in other cases.

This Court rejects Carr's cross-notice argument for several reasons. First, as Bard notes, Carr has offered no case finding waiver in similar circumstances. Second, in its Motion and at oral argument, Bard stated it has objected, and continues to object, to Carr's use of the Lehmann Report at depositions. Moreover, Bard explained a proposal it made to counsel for Carr that would allow use of the Lehmann Report for *Giordano* through a deposition "appendix" procedure,

---

1. Bard represents it will not rely on the Lehmann Report to oppose Carr's claims that the G2 Filter, a successor device to the one examined in the Lehmann Report, is allegedly defective or whether Bard acted reasonably in designing, producing, and crafting warnings for the G2 Filter (Doc. 33 at 15); nor will it rely on the Lehmann Report to support any affirmative defenses (*see* Doc. 7 at 18–27).

336

which proposal counsel for Carr rejected. Carr disputes the vigor of Bard's objections. But still, Carr admits the objections have been made. Third, counsel for Bard did not seek to depose witnesses on the basis of the Lehmann Report, counsel for Carr and other plaintiffs did. *See Marshall v. Belmont Cty. Bd. of Comm'rs,* 2014 WL 202055, at *3 (S.D.Ohio 2014) (concluding attorney-client privilege had not been waived when a defendant submitted the privileged materials in support of a motion for a finding of privilege when "it was actually plaintiff who injected privileged communications into [the] litigation by expressly disclosing the communications in the Complaint"). Fourth, the terms of the Stipulated Protective Order in this case provide that "inadverten[t disclosure] does not waive any claim for confidentiality" (Doc. 24–5 at 8). Carr has not demonstrated waiver of the Lehmann Report's work product protection.

### CONCLUSION

In sum, this Court concludes the Lehmann Report is work product; that Bard has not waived that protection; and that Carr has failed to make the showing necessary to overcome work product protection. Bard's Motion for Protective Order (Doc. 33) is granted in part. Carr is not ordered to destroy her copies of the Lehmann Report, but she may not use the content of the Lehmann Report in the prosecution of her case.

For further guidance of counsel when conducting depositions in this case, this Court adopts the Conclusion, Paragraphs (1) through (6), from the *Phillips* Order reflected as Document No. 124 on the docket of that court.

IT IS SO ORDERED.