*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TERRI BIEGAS, Personal Representative of the
Estate of RICHARD BIEGAS,
          *Plaintiff-Appellant/Cross-Appellee,*

          *v.*

QUICKWAY CARRIERS, INC.; QUICKWAY
DISTRIBUTION SERVICES, INC.,
          *Defendants-Appellees/Cross-Appellants.*

Nos. 08-1283/1285

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-73616—Nancy G. Edmunds, District Judge.

Argued: June 16, 2009

Decided and Filed: July 24, 2009

Before: MOORE, GIBBONS, and FRIEDMAN, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Vernon R. Johnson, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellant. Michael J. Hutchinson, HUTCHINSON & ASSOCIATES, Detroit, Michigan, for Appellees. **ON BRIEF:** Vernon R. Johnson, Victor S. Valenti, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellant. Michael J. Hutchinson, HUTCHINSON & ASSOCIATES, Detroit, Michigan, Lincoln G. Herweyer, LAW OFFICE, New Baltimore, Michigan, for Appellees. Nadia Ragheb, LAW OFFICES OF NADIA RAGHEB, P.C., Farmington Hills, Michigan, for Amicus Curiae.

          MOORE, J., delivered the opinion of the court, in which GIBBONS, J., joined. FRIEDMAN, J. (pp. 22-23), delivered a separate opinion dissenting in part.

_____

[*]The Honorable Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

––––––––––––––––

**OPINION**

––––––––––––––––

KAREN NELSON MOORE, Circuit Judge.  In this diversity personal-injury case, Plaintiff-Appellant Terri Biegas ("the Estate"), personal representative of the estate of Richard Biegas ("Biegas"), appeals the district court's grant of partial summary judgment in favor of Defendants-Appellees Quickway Carriers, Inc., and Quickway Distribution Services, Inc. (collectively, "Quickway"), ruling that Biegas was at least fifty-one percent at fault for the accident that caused his death.  Following a trial in which the jury was instructed that it must apportion at least fifty-one percent of the fault to Biegas, the jury returned a verdict allocating fifty-three percent of the fault to Biegas and forty-seven percent of the fault to Quickway for the negligence of its employee, truck driver Lonnie Dailey ("Dailey").  Because Michigan law bars non-economic damages in motor-vehicle-injury cases when a plaintiff is more than fifty percent at fault, the Estate was limited to forty-seven percent of economic damages and now seeks a new trial.  The Estate also appeals the district court's dismissal of its claim of gross negligence and the district court's admission at trial of certain out-of-court statements by a witness.  Quickway cross-appeals the district court's ruling that a written statement given by Dailey to Quickway two days after the accident was not protected by the work-product privilege.  For the reasons explained below, we **REVERSE** the district court's grant of partial summary judgment to Quickway on comparative negligence, **AFFIRM** the district court's dismissal of the Estate's gross-negligence claim, **AFFIRM** the district court's various evidentiary rulings, and **REMAND** for a new trial.

**I.  BACKGROUND**

At around 9:30 p.m. on July 13, 2005, Biegas was struck and killed by a passing tractor-trailer as he stood outside of his dump truck during an emergency stop along eastbound I-96 near Livonia, Michigan.  Minutes before the accident, Biegas, who owned a concrete-removal company, was driving home from a job with his employee, Nick Cohen, who rode in the passenger seat.  Attached to Biegas's red dump truck was

a flatbed trailer which was loaded with a backhoe that Biegas had used earlier that day. When properly secured to the trailer, the height of the backhoe was less than twelve-and-one-half feet. But that evening it somehow struck the overpass at Wayne Road, which has a clearance of fourteen feet. Biegas immediately pulled over and stopped on the shoulder of the highway to the right of the white fog line to check for any damage to his equipment, trailing traffic, or the overpass.

Although Cohen testified at his deposition that there was a distance of approximately two additional feet of paved shoulder between the passenger side of Biegas's dump truck and the start of the grass berm, Biegas stopped his truck very close to the fog line. A Michigan State Police ("MSP") accident reconstructionist, Sergeant Kevin Lucidi ("Lucidi"), measured the accident scene and found that the rear of Biegas's dump truck was five inches from the center of the fog line, an attachment for the backhoe on the trailer was just three-and-one-half inches from the center of the fog line, and the driver's side mirror of Biegas's dump truck actually extended some three-and-one-half inches into the roadway.

Cohen testified at his deposition that he and Biegas stepped out of the truck on their respective sides and walked to the back of the trailer. Cohen estimated that he and Biegas spent around five seconds at the rear of the trailer and found no damage to the backhoe nor any sign that trailing traffic had been hit by debris. Next, Cohen says that he looked back toward the overpass and oncoming traffic and at that moment saw Biegas through his peripheral vision moving either "on top of the trailer [or] or to the side of the trailer." Record on Appeal ("ROA") at 618 (Cohen Dep. Tr. at 56). Cohen then heard an "extremely loud" noise that "sounded like two trains hitting" and he saw, for the first time, the white Quickway tractor-trailer passing alongside Biegas's backhoe trailer. ROA at 619 (Cohen Dep. Tr. at 58). Although he did not see the tractor-trailer strike Biegas, Cohen saw Biegas's torso fall to the ground near the rear of the backhoe trailer. Cohen ran around the side of the backhoe trailer, finding Biegas's dead body near the rear driver's side tire of the backhoe trailer.

Seconds earlier, Dailey was driving the Quickway tractor-trailer around fifty-five to fifty-eight miles per hour in the right lane of eastbound I-96, where the posted speed limit for trucks is fifty-five miles per hour. At his deposition, Dailey testified that he was following another tractor-trailer by around two tractor-trailer lengths, or 150 feet. According to Dailey, it was just turning dark at the time of the accident, but with the overhead lights along the highway "it was lit up fairly well." ROA at 719 (Dailey Dep. Tr. at 55). In a handwritten statement given to MSP troopers some two hours after the accident, Dailey stated that "[a] dump truck and trailer [were] stranded partly in the right lane (which I was in)." ROA at 1019 (MSP Report at 31). Dailey recalled that he did not have "much time to react" and "steered to the left" but "hit something." *Id.* Dailey further stated that he did not realize that he had hit a person until he pulled over and was informed by a witness. Dailey testified at his deposition that he first saw Biegas's trailer after the preceding tractor-trailer had passed it and that he never saw a person around Biegas's trailer. According to Dailey, he saw part of Biegas's trailer or backhoe extended into the travel lane, so he took his foot off the gas and steered to left, but could get over only around eight inches because there were cars in the lane to his left. Dailey then heard something hit his right side-view mirror, so he pulled his tractor-trailer over onto the right shoulder and walked back to the accident scene.

The only other eyewitness to the accident was Paul Bourlier ("Bourlier"), who was passing Dailey's tractor-trailer in the lane to the left of Dailey at the time of the accident. Bourlier stopped at the scene of the accident, where he was interviewed by Trooper Lisa Lucio and gave a short handwritten statement. He also provided a more detailed typed statement the next day.[1] In his typed statement, Bourlier stated that as Dailey's tractor-trailer began to pass Biegas's stopped vehicle, Bourlier "observed an individual moving at the left rear of that vehicle" and then it appeared that Dailey's tractor-trailer had "hit something." ROA at 1000 (MSP Report at 12). "My immediate thought," stated Bourlier, "was that the semi had hit whomever had been at the rear of the stop[p]ed vehicle." *Id.*

---

[1]Bourlier died before his deposition could be taken for this case.

Based upon his accident-reconstruction analysis, Sergeant Lucidi found that Dailey's tractor-trailer struck Biegas's dump truck and attached trailer at two points. First, the right side-view mirror of Dailey's tractor struck the rear of Biegas's dump truck, leaving scrapes on the driver-side body of Biegas's red dump truck and a red paint transfer on the arm of Dailey's side-view mirror. Second, the side of Dailey's trailer scraped against a backhoe attachment on Biegas's trailer, leaving scrapes on the backhoe attachment and an approximately thirty-foot-long scrape on the side of Dailey's trailer beginning twenty-nine feet from the front bumper of the truck. In addition, Lucidi found blood and biological material on Dailey's tractor-trailer beginning at the second axle of the tractor and extending to the rear of the trailer. Given the contact between Dailey's trailer and the backhoe attachment on Biegas's trailer and the fact that the backhoe attachments were at least three inches to the right of the center of the fog line, Lucidi concluded that Dailey's trailer had crossed over the fog line at the time of the accident.[2]

Lucidi's investigation also found that Biegas must have been standing at least partially in the right lane of the highway at the time he was struck. Given the small amount of space between Biegas's trailer and the fog line, Lucidi concluded that Biegas would not have been able to remain entirely on the shoulder as he walked alongside his trailer toward the driver-side door of his truck.

On August 22, 2005, the Estate filed a complaint in Michigan state court alleging that Dailey's negligence caused Biegas's death and that Quickway was vicariously liable as the employer. On September 20, 2005, Quickway removed the action to the United States District Court for the Eastern District of Michigan based upon diversity of citizenship.

Following discovery, Quickway filed two motions. As relevant to this appeal, the first motion sought dismissal of the Estate's claim for gross negligence, arguing that Michigan law no longer recognized a separate claim for gross negligence except in

---

[2]The Estate's accident-reconstruction and trucking experts also concluded that Dailey's trailer crossed over the fog line. *See* ROA at 1711 (Robbins Aff. at 2); ROA at 1721 (Abbo Aff. at 6); ROA at 1756 (Asa Report at 3).

certain circumstances that were not applicable in this case.  Quickway's second motion sought partial summary judgment on the issue of Biegas's comparative negligence, arguing that, as a matter of law, Biegas was more than fifty percent at fault for the accident.  The Estate filed oppositions to both motions, and Quickway filed separate replies.  After hearing argument from the parties, the district court issued an opinion ruling on both motions.  The district court dismissed the Estate's gross-negligence claim, concluding that Michigan law no longer recognized the common-law concept of gross negligence except in limited statutory contexts that did not apply in this case.  The district court also granted partial summary judgment in favor of Quickway on the issue of Biegas's comparative negligence.  The district court found that, although Dailey's conduct was negligent, Biegas's negligence was greater as a matter of law.  The district court observed that Biegas "made two overriding mistakes that led to his death":

> First, he parked a truck within inches of the fog line on the shoulder of a busy interstate highway when there is no evidence that his vehicle was disabled or could otherwise not have made it to the remaining two feet of paved shoulder at its right.  Even if Biegas did not intend to walk along the driver's side of his truck, simply parking the vehicle in this location dramatically increased the risk of a collision with someone traveling in the far right lane.  Then, the evidence shows that [Biegas] must have walked into the roadway in front of oncoming traffic without first looking to see that it was clear for him to do so.  In light of such serious errors by [Biegas], no reasonable juror could find that Dailey's actions of driving up to three miles per hour over the speed limit, being 150 feet behind a preceding truck, and drifting several inches over the fog line accounted for at least 50% of the fault for this accident.

ROA at 2440-41 (D. Ct. Op. at 23-24).  One effect of the district court's ruling that Biegas was more than fifty percent at fault was to preclude the Estate from recovering noneconomic damages for Biegas's death.  *See* MICH. COMP. LAWS § 500.3135(2)(b).

On April 3, 2007, the Estate filed a motion pursuant to FED. R. CIV. P. 59(e) to alter or amend the district court's order granting Quickway partial summary judgment on comparative negligence.  After the district court denied that motion, the Estate filed a motion pursuant to 28 U.S.C. § 1292(b) to certify the order granting partial summary

judgment on comparative negligence for immediate appeal, but the district court denied certification.

The case proceeded to trial from July 12, 2007, to July 20, 2007. Before the parties made their opening statements, and over the objection of the Estate, the district court instructed the jury that in "prior proceedings" it had "already been determined that Mr. Biegas . . . is more than 50 percent at fault" and that the jury's job was "to determine how much fault from more than 50 percent to 100 percent can be attributed to the negligence of Mr. Biegas, and how much fault from zero percent to 50 percent can be attributed to the negligence of the defendant's driver, Mr. Dailey." Trial Tr. 7/12/07 at 27-28.

At the close of the evidence but before the district court instructed the jury, the Estate unsuccessfully moved for judgment as a matter of law and also requested reconsideration of the district court's summary-judgment ruling that Biegas was more than fifty-percent at fault. Consistent with its earlier rulings, however, the district court proceeded to instruct the jury that "[p]rior proceedings" had determined that Biegas was "at least 51 percent responsible for his own death" and that, if the jury should find the defendant negligent, then the jury must "apportion some level of fault for this accident to Richard Biegas in an amount between 51 and 100 percent, and some level of fault to defendants in an amount between zero and 49 percent." Trial Tr. 7/19/07 at 17-18. Similarly, the verdict form directed the jury that in apportioning negligence its number for Quickway "must be 49% or less" and its number for Biegas "must be at least 51%." ROA 2913 (Verdict Form at 2).

On July 20, 2007, the jury returned a verdict allocating fifty-three percent of the fault to Biegas and forty-seven percent of the fault to Quickway and finding total economic damages in the amount of $1,507,392. On August 30, 2007, the district court entered judgment against Quickway for forty-seven percent of the economic damages, reduced to present value, for a total of $447,614.84.

On September 14, 2007, the Estate filed a motion for a new trial pursuant to FED. R. CIV. P. 59(a), which was denied by the district court on January 17, 2008. The Estate

filed a timely notice of appeal, and Quickway followed with a timely notice of cross-appeal.

## II.  ANALYSIS

### A.  The Grant of Partial Summary Judgment on Comparative Negligence

The Estate's principal argument on appeal is that the district court erred in ruling that Biegas was more than fifty percent at fault as a matter of law.[3]  We review a grant of summary judgment de novo.  *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  We have explained that:

> The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted).  In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  Our review is limited to the evidence before the district court at the time of its partial-summary-judgment ruling, and we do not consider the evidence introduced subsequently at trial.  *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005); *see also US East Telecomms., Inc. v. US West Commc'ns Servs., Inc.*, 38 F.3d

---

[3]The Estate and amicus curiae The Michigan Association for Justice argue, in part, that this ruling by the district court denied the Estate a jury trial in violation of the Seventh Amendment to the U.S. Constitution.  However, it is well settled that "summary judgment does not violate the Seventh Amendment."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) (citing *Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 319-21 (1902)).

1289, 1301 (2d Cir. 1994) ("Our review is confined to an examination of the materials before the trial court at the time the [partial-summary-judgment] ruling was made, and neither the evidence offered subsequently at trial nor the verdict is relevant.").

Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Michigan's No Fault Act provides that a person may be "subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MICH. COMP. LAWS § 500.3135(1). The statute further provides that "[d]amages shall be assessed on the basis of comparative fault, except that damages shall not be assessed in favor of a party who is more than 50% at fault." *Id.* § 500.3135(2)(b). To prevail on a claim of negligence under Michigan law a plaintiff must show that (1) "the defendant owed a legal duty to the plaintiff," (2) "the defendant breached or violated the legal duty," (3) "the plaintiff suffered damages," and (4) "the breach was a proximate cause of the damages suffered." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993). The availability of summary judgment in diversity actions is governed by the federal standard, embodied in FED. R. CIV. P. 56, rather than by state law. *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165-66 (6th Cir. 1993); *see also* 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2712, at 219 (3d ed. 1998) ("[I]n diversity-of-citizenship actions questions relating to the availability of summary judgment, such as whether there is a disputed issue of fact that is sufficient to defeat the motion, are procedural and therefore governed by Rule 56, rather than by state law.").

Taking the facts in the light most favorable to the Estate and drawing all justifiable inferences in its favor, we believe that there is a genuine issue of material fact as to whether Biegas's negligence exceeded Dailey's.

First, as to Quickway's imputed negligence, the summary-judgment evidence showed that at the time of the accident (1) Dailey was driving the Quickway tractor-

trailer up to three miles per hour over the fifty-five-mile-per-hour speed limit, (2) Dailey was following only 150 feet behind another truck, and (3) Dailey allowed the tractor-trailer to drift across the right fog line by at least three inches to strike Biegas's truck and trailer. Dailey testified at his deposition that he was traveling between fifty-five and fifty-eight miles per hour at the time of the accident. For purposes of its summary-judgment ruling, the district court assumed that Dailey would be presumed negligent for driving over the posted speed limit in violation of MICH. COMP. LAWS § 257.627. Dailey also testified at his deposition that he was following another tractor-trailer by only approximately 150 feet, or two tractor-trailer lengths.[4] According to the Michigan Commercial Driver License Manual introduced by the Estate in its opposition to summary judgment, commercial trucks should maintain "at least one second for each ten feet of vehicle length at speeds below 40 mph," adding an additional second when traveling above forty miles per hour. ROA at 1768 (Manual § 2.7). Applying this rule, Timothy Abbo, an expert for the Estate, calculated that Dailey (who was driving a sixty-five-foot vehicle and going at least fifty-five miles per hour) should have maintained a space of at least seven-and-one-half seconds, or 600 feet, between his truck and the one in front of him. According to Abbo's affidavit, "[h]ad Dailey maintained this distance, he would have had ample time to observe the dump truck on the shoulder, notice Biegas near it, and take appropriate action to avoid a collision." ROA at 1721 (Abbo Aff. at 6).

Most important, the evidence showed that Dailey's tractor-trailer crossed over the fog line and struck portions of Biegas's truck and trailer that were within the shoulder several inches to the right of the fog line. The investigation by Sergeant Lucidi, the MSP accident reconstructionist, found that Dailey's right side-view mirror struck the rear of Biegas's dump truck and that the side of Dailey's trailer struck a backhoe attachment on Biegas's trailer, leaving a thirty-foot-long scrape on the side of Dailey's trailer. These contacts, Lucidi concluded, demonstrated that Dailey's tractor-trailer had

---

[4]In its brief on appeal, the Estate argues that there was no tractor-trailer in front of Dailey and suggests that Dailey fabricated this "phantom truck" to explain why he did not see Biegas standing next to his trailer prior to striking him. Estate Br. at 18. However, the Estate did not contest this fact at summary judgment, and none of the summary-judgment evidence contradicts Dailey's deposition testimony that he was following approximately 150 feet behind another truck.

drifted over the fog line and onto the shoulder at the time of the accident. The Estate's accident-reconstruction and trucking experts—Abbo, Donald Asa, and Ronald Robbins—also concluded that Dailey's vehicle must have crossed over the fog line when it struck Biegas.

As for Biegas's negligence, the district court rejected all of Quickway's theories of comparative negligence except for two. The district court found that Biegas was negligent in (1) failing to park his truck farther to the right on the highway's shoulder even though there were two more feet of paved shoulder on the right, and (2) walking from the shoulder into the right traffic lane without first checking for oncoming traffic. The district court concluded that these errors by Biegas outweighed Dailey's negligence and demonstrated that Biegas was more than fifty percent at fault for the accident. The Estate does not contest Lucidi's measurements at the accident scene, which found that Biegas's truck and trailer were parked just a few inches from the fog line. The Estate also concedes that Biegas was "likely partially inside, on, and partially over the fogline, near the rear of his trailer" when he was struck and killed. Estate Br. at 21. The Estate nonetheless argues that the district court erred in ruling as a matter of law that Biegas's negligence was greater than that of Dailey.

Taking the facts in the light most favorable to the Estate, we cannot say that Biegas's negligence exceeded Dailey's as a matter of law. It is clear that Biegas parked quite close to the fog line and that he should not have stepped onto the roadway without first checking for oncoming traffic. However, if Dailey had been following the preceding truck at a safe distance, he should have had sufficient time to see Biegas and move safely to the left of his own lane to avoid any contact with Biegas and his vehicle. Instead, Dailey allowed his tractor-trailer to drift at least three inches over the right fog line, sideswiping Biegas's parked vehicle and crushing Biegas's body between the two vehicles. Given that both parties bear responsibility for some substantial portion of the fault, we do not believe that this is the kind of "exceptional negligence case" in which summary judgment is appropriate. *Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir. 1965). Rather, this case turns on applying a reasonable-person standard to the

conduct of both Biegas and Dailey—a determination that is generally left to the jury. *See* 10A WRIGHT ET AL., *supra*, § 2729, at 556. We therefore believe that there is a genuine issue of material fact as to whether the negligence of Biegas in parking close to the fog line and stepping into the traffic lane exceeded the negligence of Dailey in following the preceding truck too closely and allowing his tractor-trailer to cross the fog line. Accordingly, we hold that the district court erred in granting Quickway's motion for partial summary judgment.

## B.  Harmless Error

Quickway argues in the alternative that, because the jury allocated fifty-three percent of the fault to Biegas when it could have allocated fifty-two or fifty-one percent to him, any error in the district court's summary-judgment ruling and subsequent jury instructions was harmless. According to Quickway, the verdict demonstrates that even if the jury had been given the opportunity to allocate fifty percent or less of the fault to Biegas, it would not have done so. Quickway thus contends that any error is harmless and should be disregarded under Rule 61 of the Federal Rules of Civil Procedure.[5]

We believe, however, that a properly instructed jury could have weighed the evidence of negligence by Biegas and Dailey differently and allocated fifty percent or less of the fault to Biegas. Although it is impossible to know what effect the erroneous instructions had on the jury's allocation of fault, we think it likely that the instructions affected the jury's entire analytical framework as it weighed and compared the evidence of negligent conduct by Biegas and Dailey. Having been instructed by the district court that "prior proceedings" had determined Biegas to be more at fault than Dailey, the jury may well have given greater weight to the evidence of Biegas's negligent conduct and less weight to that of Dailey. The erroneous instruction may have given the jury the

---

[5]Rule 61 of the Federal Rules of Civil Procedure provides as follows:
Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.
FED. R. CIV. P. 61.

impression that the district court had doubts about the strength of the Estate's evidence or that the district court had some other undisclosed reason for tipping the comparative-fault scale against Biegas from the start. A properly instructed jury, told nothing about the relative fault of the parties and free to assess Biegas's fault on a scale of 0% to 100% rather than 51% to 100%, could have weighed the evidence differently, splitting the fault equally or even allocating less of the relative fault to Biegas. Because the erroneous jury instructions could have affected the result of the jury's deliberations, we conclude that the error affected the Estate's substantial rights and was not harmless. Accordingly, a new trial is required so that the Estate may present its case to a properly instructed jury.

**C. Gross-Negligence Claim**

The Estate also argues that the district court erred in dismissing its gross-negligence claim pursuant to FED. R. CIV. P. 12(b)(6). We review de novo a district court's dismissal of a claim pursuant to Rule 12(b)(6). *Nixon v. Wilmington Trust Co.*, 543 F.3d 354, 356 (6th Cir. 2008). The district court noted that in *Jennings v. Southwood*, 521 N.W.2d 230, 232-34 (Mich. 1994), the Michigan Supreme Court barred all claims of common-law gross negligence under Michigan law except in certain contexts in which Michigan law exculpates actors for mere negligent conduct. Concluding that this limited exception did not apply in this case, the district court dismissed the Estate's gross-negligence claim.

Prior to its adoption of a pure comparative-negligence scheme in *Placek v. City of Sterling Heights*, 275 N.W.2d 511 (Mich. 1979), Michigan adhered to the doctrine of contributory negligence under which a plaintiff found to be even slightly at fault was completely barred from recovery. *Jennings*, 521 N.W.2d at 233. Michigan courts recognized gross negligence as an exception to the contributory-negligence doctrine in order to mitigate the often harsh consequences of that doctrine to plaintiffs. *Id.* Although "gross negligence" typically implies a higher degree of negligence, in Michigan it was "merely an alternative label used to describe the doctrine of last clear chance" and allowed a plaintiff to recover when the defendant's negligence (even ordinary negligence) occurred after the plaintiff's negligent conduct. *Id.* In *Jennings*,

the Michigan Supreme Court repudiated the common-law concept of gross negligence, reasoning that when it abandoned the contributory-negligence doctrine in *Placek* the concept of gross negligence was no longer needed.  *Id.*

However, the *Jennings* court recognized that a different concept of "gross negligence" survived in certain Michigan statutes—including the Emergency Medical Services Act (EMSA) which was at issue in *Jennings*—in which certain actors are immune from liability for ordinary negligence but may be liable for conduct reaching a grossly negligent level.  *Id.* at 235.  In this context, "gross negligence" means "'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'"  *Id.* (quoting Government Tort Liability Act, MICH. COMP. LAWS § 691.1407(7)(a)).

As the district court observed, the Estate does not argue that any such statutes are applicable in this case.  Furthermore, the two unpublished Michigan Court of Appeals cases cited by the Estate are readily distinguishable.  Each involved situations analogous to *Jennings* in which a defendant could not be held liable for ordinary negligence but could be held liable for heightened or gross negligence.  *See Hawkins v. Ranch Rudolf, Inc.*, No. 254771, 2005 WL 2372008, at *3-4 (Mich. Ct. App. Sept. 27, 2005) (unpublished) (reversing dismissal of gross-negligence claim where plaintiff signed a release waiving liability for ordinary negligence but waiver did not cover gross negligence under Michigan law); *Thomas v. CSX Transp., Inc.*, No. 208311, 1999 WL 33432173, at *2-3 (Mich. Ct. App. Nov. 2, 1999) (unpublished) (reversing dismissal of gross-negligence claim in premises-liability action where the plaintiff-trespasser could recover only by showing either active negligence or gross negligence).

Unlike *Hawkins* and *Thomas*, in which the defendants could not be held liable for mere negligence, there is no such obstacle in the instant case.  The Estate need not show that Dailey's conduct rose to the level of gross negligence or recklessness.  Instead, Dailey (and Quickway by imputation) may be held liable upon a showing of ordinary negligence.  Accordingly, the district court did not err in ruling that under Michigan law a gross-negligence claim is not cognizable in this case.

**D. Admissibility of Cohen's Out-of-Court Statements**

The Estate argues that the district court abused its discretion by permitting the introduction of two statements allegedly made by Nick Cohen, Biegas's passenger, at the accident scene: (1) Cohen's statements to Dailey and Paul Bourlier telling them to keep Biegas's money which they had picked up at the scene; and (2) Cohen's statement to Dailey that Cohen had told Biegas prior to the accident to "get out of the road, he was going to get hit." Trial Tr. 7/16/07 at 85. The district court admitted the statements, ruling that they fell within the excited-utterance exception to the hearsay rule. We review evidentiary rulings by the district court, including determinations of whether testimony is inadmissible hearsay, for abuse of discretion. *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008). Whether a statement is hearsay is a question of law, which we review de novo. *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).

The first question is whether the statements at issue are hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. FED. R. EVID. 801(c). As to Cohen's utterances to Dailey and Bourlier telling them to keep Biegas's money, it is clear that Quickway offered these statements for the fact that Cohen had made them, not to prove the truth of any proposition. *Rodriguez-Lopez*, 565 F.3d at 314 ("A statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay."). Because these utterances were not offered to prove the truth of the matter asserted, they are not hearsay, and the district court did not abuse its discretion in admitting Dailey's testimony concerning these statements.

Turning to Cohen's statement to Dailey that he had told Biegas before the accident to "get out of the road, he was going to get hit," this consists of two statements: (1) the out-of-court statement by Cohen to Biegas and (2) the out-of-court statement by Cohen to Dailey recounting his earlier statement to Biegas. We consider each layer in turn.

The first layer—Cohen's statement to Biegas to "get out of the road"—is not hearsay because it was not offered for its truth content. This statement was not offered to prove that Biegas was in fact standing in the travel lane at the time of the accident, but

rather to show that Biegas had been put on notice that he was in imminent danger and should have been aware of the risk he faced.  A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay.  *United States v. Horton*, 847 F.2d 313, 324 (6th Cir. 1988).  Cohen's statement was offered for its probable effect on Biegas in the moments before the accident.  Under Quickway's theory of the case, Biegas was so upset at the time that he ignored Cohen's warning and continued to walk in the travel lane where he was struck by Dailey's tractor-trailer.

The second layer—Cohen's statement to Dailey recounting his earlier statement—is hearsay.  This statement was offered for its truth content—to prove that Cohen had in fact told Biegas earlier to "get out of the road."  Accordingly, we consider whether the district court correctly ruled that the excited-utterance exception applies to this statement.

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." FED. R. EVID. 803(2).  The premise behind this exception to the hearsay rule is that "a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance he makes will be spontaneous and trustworthy." *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983) (internal quotation marks omitted), *cert. denied*, 464 U.S. 1071 (1984).  The excited-utterance exception applies when "1) there [is] an event startling enough to cause nervous excitement; 2) the statement [is] made before there is an opportunity to contrive or misrepresent; and 3) the statement [is] made while the person [is] under the stress of the excitement caused by the event." *United States v. Beverly*, 369 F.3d 516, 539-40 (6th Cir.), *cert. denied*, 543 U.S. 910 (2004).  This court previously has explained that "the ultimate question is whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." *Haggins*, 715 F.2d at 1058 (internal quotation marks omitted).

The first element is satisfied because Cohen witnessed a terrible accident that dismembered and killed his friend and employer.  Although Cohen did not see the tractor-trailer strike Biegas, he saw Biegas's torso fall to the ground and saw what he thought were pieces of Biegas's head, arm, and other body parts scattered across the travel lanes.  The record makes clear, therefore, that Cohen witnessed an accident startling enough to cause nervous excitement.

The second element asks whether the statement was made before there was an opportunity to fabricate or misrepresent.  *Beverly*, 369 F.3d at 539-40.  Although the record does not indicate precisely when Cohen made this statement to Dailey, it appears that it was made within a few minutes of the accident, before the arrival of police and paramedics.  At his deposition, Cohen testified that immediately after Biegas was struck, he ran into the traffic lane to try to prevent cars from hitting Biegas's scattered body parts.  Next, Cohen began running eastbound along the right shoulder and called 911.  At that point he came upon Dailey and Bourlier, who were walking from the other direction toward Biegas's truck.  Dailey testified at trial that he had been approached by Bourlier immediately after he pulled onto the shoulder.  After Bourlier told Dailey that he thought Dailey had run over a person, the two men began walking back westbound along the right shoulder towards Biegas's truck.  They came upon Cohen between the two trucks after walking around one-hundred feet.  According to Dailey, only a few minutes elapsed between the time of the accident and their encounter with Cohen, at which time Cohen made the out-of-court statement at issue.

In light of the short time frame and Cohen's conduct following the accident, we do not believe that Cohen had an opportunity to fabricate.  Cohen had witnessed the accident and its horrific aftermath just minutes earlier.  In the moments that followed the accident, Cohen ran into the traffic lanes, began running up the shoulder, called 911, and then came upon Dailey and Bourlier.  There is no evidence that Cohen had a spare moment, much less an opportunity to recover from the experience, reflect upon the events, and fabricate a statement concerning what he had said to Biegas minutes earlier.

The third element asks whether the statement was made while the declarant was still under the stress of excitement caused by the event. *Beverly*, 369 F.3d at 539-40. "Relevant factors in determining whether a speaker remains under the stress of the excitement include (1) the lapse of time between the event and the declarations; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements." *Maggard v. Ford Motor Co.*, No. 07-6494, 2009 WL 928604, at *5 (6th Cir. Apr. 7, 2009) (unpublished) (internal quotation marks omitted). Although there is contradictory evidence concerning Cohen's mental state, the record as a whole suggests that Cohen remained under the stress of excitement caused by the accident at the time he made the statement. Minutes earlier, Cohen had witnessed a gruesome scene in which Biegas's body had been dismembered and body parts had been strewn across the highway. Cohen testified at his deposition that as he ran into the traffic lane to try to prevent drivers from running over Biegas's body parts, he was "screaming and crying." ROA at 620 (Cohen Dep. Tr. at 63). Cohen then began running eastbound along the shoulder. "I don't know why," Cohen testified, "I just started running." *Id.* at 64. When Cohen met Dailey on the shoulder, the two men began consoling each other and "holding each other." ROA at 621 (Cohen Dep. Tr. at 66). Cohen testified at trial that the accident had been a shocking event and that he had been in a state of shock afterwards. Although Cohen also testified that he never talked to Dailey, Cohen acknowledged that it was possible that he did not recall doing so because he was in a state of shock at the time. In sharp contrast to Cohen's testimony about his own mental state, Dailey testified at trial that when he met Cohen along the shoulder, Cohen "seemed happy" and was not agitated. Trial Tr. 7/16/07 at 82. When pressed on the point, Dailey acknowledged that Cohen "could have been in shock. I don't know," but Dailey said that Cohen did not appear to be in shock. *Id.* at 83.

Despite this contradictory testimony concerning Cohen's mental state, the weight of the evidence indicates that Cohen remained under the stress of excitement from the accident. Only a few minutes had elapsed following an unusually horrific accident, and Cohen's own testimony was that he was in a state of shock at the time. Moreover,

Cohen's statement to Dailey related to the subject matter of the accident. "When the subject matter of the statement involves the startling event itself, the subject matter supports a finding that the declarant was still under the stress of the accident." *Maggard*, 2009 WL 928604, at \*6. In sum, the record in this case indicates that Cohen's statement to Dailey was not the product of reflective thought but rather a spontaneous reaction to the stress of the accident he had just witnessed.

Because Cohen's earlier statement to Biegas is not hearsay and Cohen's statement to Dailey falls within the excited-utterance exception, the district court did not abuse its discretion in admitting Dailey's testimony concerning Cohen's statement.

## E. Work-Product Privilege

On cross-appeal, Quickway argues that the district court erred in ruling that a written statement given by Dailey to Quickway two days after the accident was not protected by the work-product privilege. On July 9, 2007, the district court granted the Estate's motion to compel production of Dailey's written statement to Quickway, rejecting without discussion Quickway's assertion that the document was protected by the work-product privilege.

"We review a district court's work product privilege determination for abuse of discretion." *United States v. Roxworthy*, 457 F.3d 590, 592 (6th Cir. 2006). As set forth in Federal Rule of Civil Procedure 26(b)(3), the work-product privilege protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." FED. R. CIV. P. 26(b)(3). "Once the party requesting discovery establishes relevance, the objecting party has the burden of showing that the material was prepared in anticipation of litigation or for trial." *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006) (internal quotation marks omitted). In determining whether a document was prepared "in anticipation of litigation," this court asks whether it was prepared or obtained "because of" the prospect of litigation. *Roxworthy*, 457 F.3d at 593. The test to determine whether a document was prepared "because of" the prospect of litigation has both a subjective and an objective element and asks: "(1) whether a document was created because of a party's

subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *Id.* at 594.

This court has explained that "a party may satisfy its burden of showing anticipation of litigation 'in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories,' and that the showing 'can be opposed or controverted in the same manner.'" *Id.* at 597 (quoting *Toledo Edison Co. v. G A Techs., Inc.*, 847 F.2d 335, 339 (6th Cir. 1988)). "Where an undisputed affidavit . . . is specific and detailed to indicate that the documents were prepared in anticipation of litigation or trial, then the party claiming work product protection has met its burden. However, application of the privilege will be rejected where the only basis for the claim is an affidavit containing conclusory statement[s]." *Id.* (internal quotation marks and citation omitted) (alteration in original).

In the instant case, Quickway came forward with no affidavits, depositions, or equivalent proof showing that Dailey's written statement was prepared in anticipation of litigation. It is undisputed that Dailey's statement, which describes the events surrounding the accident, is relevant. Quickway, therefore, had the burden of showing that the statement was prepared in anticipation of litigation. Quickway's response to the Estate's motion to compel, however, was unaccompanied by any form of proof showing that Dailey's statement was created in anticipation of litigation. Instead, the only evidentiary material attached to Quickway's response was a sixteen-page excerpt from Dailey's deposition, which Quickway cited for the proposition that the Estate had failed to show substantial need and undue hardship. Indeed, the bulk of Quickway's response (like its appellate brief) was devoted to arguing that the Estate had failed to demonstrate substantial need and undue hardship.

Quickway fails to recognize that it first had the burden of showing that the document was prepared "in anticipation of litigation" before the burden shifted to the Estate to show substantial need and undue hardship. *See In re Powerhouse Licensing,*

*LLC*, 441 F.3d at 473 (explaining that if the objecting party fails to meet its burden of showing that the document was prepared in anticipation of litigation, "the court's inquiry ends and the documents must be produced").  Quickway did not come forward with any affidavits or similar proof demonstrating that Dailey's statement was prepared in anticipation of litigation, much less the kind of "specific and detailed" evidentiary material that would be sufficient to meet this burden.  *Roxworthy*, 457 F.3d at 597. Because Quickway failed to carry its burden of demonstrating that Dailey's written statement was prepared in anticipation of litigation, the district court did not abuse its discretion in rejecting Quickway's claim that this document was protected by the work-product privilege.

### III.  CONCLUSION

For the reasons explained above, we **REVERSE** the district court's partial-summary-judgment ruling that Biegas was more than fifty percent at fault, **AFFIRM** the district court's dismissal of the Estate's gross-negligence claim, **AFFIRM** the district court's evidentiary rulings, and **REMAND** for a new trial consistent with this opinion.

---

**DISSENTING IN PART**

---

FRIEDMAN, Circuit Judge, dissenting in part. I join the court's opinion, except for Part II B, captioned "Harmless Error." It holds that the trial court's instruction to the jury that Biegas was more than 50 percent at fault in the accident was not harmless error. I come out the other way on that issue.

The trial judge instructed the jury that he had determined that Biegas was at least 51 percent at fault for the accident, and that the jury could find that Biegas' fault ranged from 51 percent to 100 percent (the "limiting instruction"). The jury found that Biegas was 53 percent at fault.

If the jury had found that Biegas' degree of fault was 51 percent, I would agree that the error in giving the limiting instruction was not harmless. For in that situation the jury's verdict could have equally well rested on either of two inconsistent theories. It could have reflected the jury's independent judgment that Biegas was in fact 51 percent responsible for the accident. Or it could have reflected the jury's conclusion that although it believed Biegas' fault was less than 51 percent, the court's instruction required it to set his fault at that level. In the latter situation, it could not be said that without the limiting instructions the jury likely would have concluded that Biegas' level of fault was less than 51 percent.

In the present case, however, the jury's verdict that Biegas' fault was 53 percent necessarily reflected the jury's independent determination that his fault exceeded the 51 percent minimum it was required to apply. In that circumstance, I cannot say that there was any realistic likelihood that, without the limiting percent instruction, the jury would have assessed Biegas' fault level at less than 51 percent. The court's contrary conclusion - resting upon statements that the jury "could have" weighed the evidence of comparative negligence differently, "may well have" or "could have" evaluated the evidence differently - is speculation and is insufficient to justify the conclusion that any error in the instruction was prejudicial.

We cannot say precisely what the jury would have done without the limiting instruction.  We deal, however, with possibility, probability, and likelihood, not certainty.  In the circumstances here I think the likelihood that without the limiting instruction the jury could or would have set Biegas' fault at less than 51 percent is too slim to warrant concluding that the erroneous limiting instruction was not harmless.

I would affirm the district court's judgment.