NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0199n.06

Case No. 25-3740

FILED
May 04, 2026
KELLY L. STEPHENS, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

TOUCH-N-BUY LLC; TOUCH-N-BUY-MI, LLC; TOUCH-N-BUY, LP,

    Plaintiffs-Appellants,

v.

UNITED CONSUMER FINANCIAL SERVICES,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: SUTTON, Chief Judge; DAVIS and RITZ, Circuit Judges.

DAVIS, Circuit Judge. Touch-N-Buy LLC contracted with United Consumer Financial Services ("UCFS") to serve as an independent sales representative. In that role, Touch-N-Buy solicited merchants to enter into merchant agreements with UCFS and promoted UCFS as a preferred financier for consumer purchases. When UCFS terminated its agreement with Touch-N-Buy, it indicated that its obligation to pay Touch-N-Buy commissions would end once it paid on merchant contracts Touch-N-Buy had successfully solicited during the 90-day termination window—a move that violated their agreement, says Touch-N-Buy. UCFS also modified the terms of some merchant contracts without notifying Touch-N-Buy and took other actions that Touch-N-Buy claims interfered with its business relationships with merchants. On appeal, we consider whether Touch-N-Buy's complaint sets forth a plausible claim that UCFS breached the parties' agreement by declining to award Touch-N-Buy post-termination commissions and whether the district court erred in dismissing Touch-N-Buy's tortious-interference, fraud,

unjust-enrichment, and promissory-estoppel claims.  Concluding that the district court did not err, we AFFIRM.

## I.

### A. Factual Background

UCFS provides "consumer financing for in-home products and services, retail products and professional services."  (Term. Letter, R. 1, PageID 37 (citation modified)).  As relevant to this appeal, plaintiffs Touch-N-Buy LLC, Touch-N-Buy-MI, LLC, and Touch-N-Buy, LP (collectively "Touch-N-Buy") provide contract solicitation and promotional services.  The parties entered an independent representative agreement ("IRA" or "agreement"), which Touch-N-Buy appended to its complaint.  The IRA identified Touch-N-Buy as UCFS's "non-exclusive representative." (I.R.A., R. 1, PageID 20).  The parties also entered into a separate confidentiality agreement.

The IRA's terms obligated Touch-N-Buy to "solicit merchants to enter into Merchant Agreements" with UCFS related to "sheds and outdoor structures," "roofing," "plumbing," and "others as agreed to by [the] parties." (*Id.* at PageID 19, 30 (citation modified)).  It also required Touch-N-Buy to promote UCFS as a "preferred financier[]" on consumer purchases within the continental United States. (*Id.* at PageID 19).

The IRA's payment structure was commission-based.  Touch-N-Buy received a commission for each merchant agreement it solicited and UCFS accepted.  Paragraph 6(A) of the IRA provides:

> Except as otherwise provided herein, [UCFS] shall pay to [Touch-N-Buy], as full and final compensation for the services rendered and to be rendered by [Touch-N-Buy] hereunder, a commission upon all accepted Agreements.

(*Id.* at PageID 21, ¶6(A)). But to qualify for the commission, solicited contracts had to meet certain minimum volume requirements. Assuming those thresholds were met, UCFS was obligated to pay Touch-N-Buy a 2% commission on the amount financed, less certain amounts, plus certain bonuses. UCFS retained the right under IRA Paragraph 3 to modify any of the solicited agreements and had to provide Touch-N-Buy written notice of the same.

Touch-N-Buy "dutifully complied with its obligations" under the agreement from August 2017 through February 2024. (Compl., R. 1, PageID 4–5, ¶13). Over the course of the parties' relationship, the merchants that Touch-N-Buy successfully solicited for UCFS borrowed over $100 million, with an average annual percentage rate of 20% interest. This meant that Touch-N-Buy was earning its 2% commission, plus other incentives and bonuses under the IRA.

UCFS eventually concluded, however, that it "didn't get enough value from the relationship" and elected to terminate the agreement. (*Id.* at PageID 5, ¶15). Several provisions of the IRA addressed termination of the agreement. Paragraph 14 is the main provision covering termination. It provides:

> This Agreement may be terminated at any time by either party, for convenience, upon ninety (90) days prior written notice given by registered mail addressed to the other party at the address set forth in this Agreement. . . . Commissions will continue for all contracts accepted prior to termination of this Agreement.

(I.R.A., R. 1, PageID 24, ¶14). Then, Paragraph 6(F) in the "Compensation" provision of the agreement provides additional details on Touch-N-Buy's entitlement to commissions in the event of termination under Paragraph 14:

> In the event of termination of this Agreement pursuant to Paragraph 13, 14 or 15 below, [Touch-N-Buy] shall be entitled to applicable commissions (see respective Schedule Cs) on all accepted Merchants' contracts, prior to the effective date of termination.

(*Id.* at PageID 21, ¶6(F)).  And Paragraph 13 outlines the parties' obligations and rights in the event the Agreement was terminated:

> Upon termination for any reason, [Touch-N-Buy] shall immediately return to [UCFS], in good condition, all property of [UCFS].  [UCFS] shall have the right to withhold any amounts due to [Touch-N-Buy] until all items are returned and all obligations of [Touch-N-Buy] under this Agreement are performed.  When all obligations are satisfied, [UCFS] shall make final payment of commission to [Touch-N-Buy], less applicable reductions for uncollected accounts, returns and other amounts due [UCFS].

(*Id.* at PageID 24, ¶13).

In a February 26, 2024, letter, UCFS invoked the IRA's 90-day termination provision.  It indicated that termination would be "effective 90 days from the date of th[e] letter" and advised that UCFS would issue its final payment once Touch-N-Buy complied with its "remaining obligations under the Agreement."  (Term. Letter, R. 1, PageID 37).  Both before and after the termination letter, UCFS continued to accept agreements with merchants that Touch-N-Buy referred.  But it also directly contacted merchants solicited by Touch-N-Buy, and it modified the terms of other agreements "without notifying [Touch-N-Buy] as expressly agreed."  (Compl., R. 1, PageID 5, ¶18).  The termination became effective on May 26, 2024.  And UCFS stated that its obligation to pay Touch-N-Buy commissions ended after paying for "contracts originated during the 90-day termination period."  (*Id.* at PageID 6, ¶22).  But because UCFS continued "buy[ing] new contracts" from merchants Touch-N-Buy had secured after the IRA's effective termination date, Touch-N-Buy's complaint seems to suggest that Touch-N-Buy is owed commissions on those contracts, too.  (*Id.* at PageID 5, ¶18).  Touch-N-Buy does not allege that UCFS failed to make commission payments pre-termination.   But it asserts that UCFS "repudiat[ed] its obligations under the contract before performance was due."  (*Id.* at PageID 11, ¶61).

*B. Procedural Background*

Touch-N-Buy brought this lawsuit against UCFS for unjust enrichment, fraudulent misrepresentation, breach of contract, promissory estoppel, tortious interference with a business expectancy, and requests for declaratory relief and accounting. After the case was transferred from federal district court in Michigan to Ohio, UCFS moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion to dismiss in full. Touch-N-Buy timely appealed.

**II.**

We review de novo a district court's grant of a motion to dismiss under Rule 12(b)(6). *Hester v. Chester County*, 162 F.4th 780, 784 (6th Cir. 2025). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In most instances, our review is "limited to the four corners of the complaint," requiring us to take the facts alleged as true and to draw all reasonable inferences in the nonmovant's favor. *Id.* We may, however, "consider documents attached to the complaint or incorporated by reference that are central to the claim." *Id.* If the document "utterly discredit[s]" the complaint's allegations (meaning it "contradicts" them), then "the document trumps the allegations." *In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020) (citation modified). Here, the IRA is central to Touch-N-Buy's claims, and it has attached the IRA to the complaint, as well as UCFS's termination letter and a confidentiality agreement between the parties.

**III.**

*A. Breach of Contract*

Touch-N-Buy argues that Paragraph 14 of the agreement "plausibly provides for post-termination commissions," so UCFS's failure to pay those commissions breached the contract and the district court erred in granting UCFS's motion to dismiss. (Appellants' Br., ECF 11, 9). It is useful to narrow in on what Touch-N-Buy means by "post-termination commissions." In the district court, Touch-N-Buy seemed to focus on commissions for new contracts that UCFS negotiated with merchants after termination of the IRA, whose prior contract(s) originated from Touch-N-Buy. The district court rejected that argument and found that although UCFS owed Touch-N-Buy commissions for merchant contracts UCFS accepted before termination, it did not owe commissions on any such contracts it accepted after termination.

Now on appeal, Touch-N-Buy centers its argument on merchant contracts it "generated" before termination, arguing that under Paragraph 14 of the IRA, payments on those contracts were to "continue and survive the termination." (*Id.* at 9–10). Because the contract language as a whole demonstrates that UCFS's obligation to pay commissions ended with termination of the IRA, this claim fails.

The IRA contains a choice-of-law provision that requires the parties to apply Ohio law. To show a breach of contract under Ohio law, Touch-N-Buy must prove that (1) a contract existed, (2) it performed under the contract, (3) UCFS breached the contract, and (4) Touch-N-Buy suffered damages or loss. *Spitzer Autoworld Akron, LLC v. Fred Martin Motor Co.*, 253 N.E.3d 212, 223 (Ohio Ct. App. 2024). Our "principal objective" in construing the agreement here is to determine and effectuate the parties' intent. *Id.* (citation omitted). If the terms are clear, we are constrained to look at the agreement's plain language to ascertain intent. *Id.*

We thus turn our attention to the IRA's language. Touch-N-Buy insists that the IRA is ambiguous. But for that to be true, the relevant provisions must be "susceptible of more than one reasonable interpretation." *Id.* (citation omitted). Touch-N-Buy says that Paragraph 14, the termination provision, fits the bill. Specifically, it asserts that the closing sentence of that provision—stating, "Commissions will continue for all contracts accepted prior to termination of this Agreement"—is susceptible to multiple reasonable interpretations. (I.R.A., R. 1, PageID 24, ¶14). And Touch-N-Buy says that one of those interpretations is that it will continue to receive commissions beyond the termination of the parties' agreement. In determining whether the provision is ambiguous, however, we do not read Paragraph 14 in isolation. Ohio law requires us to read the whole contract, with "the intent of each part [to be] gathered from a consideration of the whole." *Spitzer*, 253 N.E.3d at 225 (citation omitted). That means we cannot put on blinders and focus on a particular provision in isolation or "detached" from the whole agreement. *Id.* (citation modified). When we can, we must "harmonize" all contractual provisions instead of "produc[ing] conflict in them" and "reconcile" rather than "ignore[]" any "inconsistent contract terms and give effect to each term." *Bay Shore Power Co. v. Oxbow Energy Sols., LLC*, 969 F.3d 660, 666 (6th Cir. 2020) (citation modified). And when two contract clauses seem inconsistent, Ohio law tells us that "the specific clause prevails over the general." *Lawhorn v. Joseph Toyota, Inc.*, 750 N.E.2d 610, 614 n.6 (Ohio Ct. App. 2001) (citation omitted).

Looking at the agreement as a whole, three of its provisions lead us to conclude that the parties did not contract for post-termination commissions. *Spitzer*, 253 N.E.3d at 225; *see Bay Shore Power Co.*, 969 F.3d at 666. Start with the "Compensation" provision, which specifically speaks to circumstances affecting Touch-N-Buy's entitlement to commissions. To refresh, Paragraph 6(F) provides in relevant part: "In the event of termination of this

Agreement . . . [Touch-N-Buy] shall be entitled to *applicable commissions* . . . on all accepted Merchants' contracts, *prior to the effective date of termination*." (I.R.A., R. 1, PageID 21, ¶6(F) (emphasis added)). Like the district court, we resort to the rules of grammar to interpret this provision. After all, Ohio courts have recognized that the rules of grammar are "elemental" in reading and understanding contracts. *Oliveri v. OsteoStrong*, 171 N.E.3d 386, 391 (Ohio Ct. App. 2021). Thus, "[p]roper contract interpretation includes the application of ordinary rules of grammar." *Id.* And applying those ordinary rules here, "dependent clauses must modify some part of the main clause." *Keller v. Foster Wheel Energy Corp.*, 837 N.E.2d 859, 862–63 (Ohio Ct. App. 2005).

Paragraph 6(F)'s "prior to the effective date of termination" language is a dependent clause that modifies the preceding main clause. (I.R.A., R. 1, PageID 21, ¶6(F)). And based on its plain language, the rules of grammar lead us to conclude that "prior to the effective date of termination" is best read as modifying "applicable commissions." (*Id.*). Explaining further, Paragraph 6(F) contains a main clause and *two* dependent clauses. In grammar, a main (or independent) clause can stand alone as its own sentence, while a dependent clause cannot. Here, the main clause is: "[Touch-N-Buy] shall be entitled to applicable commissions (see respective Schedule Cs) on all accepted Merchants' contracts." (*Id.*). Because Paragraph 6(F)'s other two clauses—"In the event of termination of this Agreement pursuant to Paragraph 13, 14 or 15 below" and "prior to the effective date of termination"—cannot not stand by themselves, they are dependent clauses. And both clauses modify "applicable commissions," explaining the "what," i.e., a specific circumstance ("termination") and "when," ("prior to the effective date of termination") affecting entitlement to commissions. (*Id.*) What's more, although Touch-N-Buy suggests that the prior-to-termination clause modifies the so-called accepted-contracts clause, "[n]o rule of grammar or common usage

supports [the idea] that one dependent clause . . . modifies another dependent clause." *Keller*, 837 N.E.2d at 863. After all, "on all accepted contracts" does not stand on its own; it is a descriptor for the commissions. So we conclude that under Paragraph 6(F), termination of the agreement cut off Touch-N-Buy's entitlement to commissions.

Our review of Paragraph 14's termination provision does not alter our conclusion. Touch-N-Buy homes in on that provision's last sentence: "Commissions will continue for all contracts accepted prior to termination of this Agreement." (I.R.A., R. 1, PageID 24, ¶14). Standing alone, this language could be understood to mean that commissions continue beyond termination so long as UCFS accepted a contract before the effective date of termination. But, again, we do not read this language in a vacuum. *Spitzer*, 253 N.E.3d at 225. And we can reconcile the disputed language in Paragraph 14 by viewing it alongside other language in that paragraph, and in Paragraphs 6(F) and 13. *See Bay Shore Power Co.*, 969 F.3d at 666. In addition to the disputed "will continue" language, Paragraph 14 contains language that allows either party to terminate the agreement "at any time" and "for convenience" "upon ninety (90) days prior written notice." (I.R.A., R. 1, PageID 24, ¶14). With our understanding of Paragraph 6(F), we read Paragraph 14 to say that throughout the 90-day notice window, UCFS's obligation to pay commissions continued, regardless of whether UCFS accepted a merchant agreement before the onset of the 90-day window or during its pendency.

Paragraph 13 lends support to this interpretation. That paragraph gave UCFS the right to withhold amounts owed to Touch-N-Buy until it returned property and performed all of its obligations under the IRA. And after Touch-N-Buy did so, UCFS was obligated to "make final payment of commission to [Touch-N-Buy]." (*Id.* at PageID 24, ¶13). We agree with the district court's reading of this provision. In conjunction with Paragraphs 6(F) and 14, once the 90-day

notice window expired and termination was effective, Touch-N-Buy had to return all company property to UCFS and satisfy any outstanding obligations before UCFS had to make the final commission payment.  As the district court found, the words "final" and the singular form of "payment" support reading the agreement as contemplating the resolution of commission payments at termination.  (*Id.*).  Thus, the combined effect of Paragraphs 6(F), 13, and 14 is that Touch-N-Buy's right to commissions ended with the effective date of termination.  So Touch-N-Buy's theory that UCFS repudiated and breached the agreement by stating that it would "pay . . .commissions for contracts originated during the 90-day termination period" does not state a plausible claim for relief.  (Compl., R. 1, PageID 6, ¶22).  And Touch-N-Buy's breach-of-contract claim fails.

Touch-N-Buy offers several rejoinders that do not persuade.  First, it argues that Paragraphs 6(F) and 14 conflict and thus create ambiguity.  But as the provision specific to compensation, Paragraph 6(F) would control, not Paragraph 14.  *Lawhorn*, 750 N.E.2d at 614 n.6 (explaining that among two conflicting provisions, the specific provision "overrides" the general one).  At any rate, the provisions do not conflict, and they can be harmonized, as we explained.  *See Bay Shore Power Co.*, 969 F.3d at 666.  And Touch-N-Buy is wrong to suggest that there is "no contradiction" between its allegations, its theory of the case, and the agreement's language.  (Appellants' Br., ECF 11, 12).  In its complaint, Touch-N-Buy alleged that the agreement "*explicitly state*[*d*]" that "all payment[s] on merchant contracts brought by [Touch-N-Buy] are to continue, surviving termination."  (Compl., R. 1, PageID 6, ¶22 (citation modified)).  Yet the language Touch-N-Buy quoted does not appear in the agreement, thus "utterly discredit[ing]" this allegation.  *In re Flint Water Cases*, 960 F.3d at 329 (citation omitted).  Last, Touch-N-Buy offers only two conclusory allegations that UCFS "breached" or "violated" the separate confidentiality agreement between

the parties. (Appellants' Br., ECF 11, 6, 11). But both the complaint and briefing fail to identify what part of that agreement was allegedly breached or explain how that agreement remained in effect in 2024 given its apparent three-year effective period from "July 25, 2017." (Conf. Agreement, R. 1, PageID 39–40). Therefore, Touch-N-Buy has not alleged facts sufficient to state a claim for breach of the confidentiality agreement.

## B. Tortious Interference with Business Expectancy

Touch-N-Buy also challenges the district court's dismissal of its claim of tortious interference with a business expectancy, arguing that the court applied an "unduly stringent" pleading standard and "discounted" Touch-N-Buy's well-pleaded facts. (Appellants' Br., ECF 11, 13–14). But this argument fails because the complaint's allegations do not raise a right to relief beyond a speculative level.

In Ohio, claims for tortious interference with a business expectancy or relationship arise "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another." *Coventry Grp., Inc. v. Gottlieb*, 7 N.E.3d 611, 613 (Ohio Ct. App. 2014) (citation omitted). To survive dismissal, Touch-N-Buy had to show: (1) a contractual or business relationship; (2) UCFS's knowledge of the relationship; (3) an intentional and improper act by UCFS "preventing formation of a contract, procuring breach of a contract, or termination of a business relationship"; (4) UCFS's lack of privilege; and (5) resulting damages. *Grubb & Assocs. LPA v. Brown*, 119 N.E.3d 836, 842 (Ohio Ct. App. 2018) (citation omitted).

Touch-N-Buy alleged that UCFS's conduct "tarnished" Touch-N-Buy's business expectancy with its agents when it contacted them and "vendors" to "disrupt[] [Touch-N-Buy's] ongoing relationships and business dealings." (Compl., R. 1, PageID 12–13, ¶¶70, 74). On appeal,

Touch-N-Buy identifies three categories of allegations that it says support this claim: (1) UCFS continuing to buy merchant contracts after termination, (2) UCFS modifying agreement terms and criteria with existing merchants without telling Touch-N-Buy, and (3) UCFS tarnishing Touch-N-Buy's relationship with one of its agents.

At the outset, the district court rightly noted that Touch-N-Buy rooted its tortious-interference claim in UCFS's obligations under Paragraph 14 of the IRA.  So to the extent Touch-N-Buy bases this claim on its expectancy to receive post-termination commissions, we reject that position as we did for its breach-of-contract claim.

We also agree with the district court's observation that the complaint's most detailed allegations relating to this claim concern UCFS changing applicant and merchant criteria and modifying merchant-agreement terms without telling Touch-N-Buy.  These allegations span the first two categories discussed above.  The actions described, says Touch-N-Buy, ultimately negatively affected its service to merchants and enabled UCFS to obtain merchant information and thereby bypass Touch-N-Buy to offer better terms to merchants—resulting in less commissions for Touch-N-Buy.  But the complaint does not identify any merchant or applicant with whom UCFS took such actions.  Instead, it generically refers to "various agents and vendors." (Compl., R. 1, PageID 13, ¶74).  Yet surviving a motion to dismiss requires identifying a specific "contractual or business relationship" with which the defendant interfered.  *Grubb*, 119 N.E. 3d at 842–43; *see also Rieck v. Hous. Auth. of Covington*, No. 22-5788, 2024 WL 556221, at *5 (6th Cir. Feb. 12, 2024) (observing that Kentucky tortious-interference claims, which have similar elements, require knowledge of and interference with "a *specific* business relationship." (emphasis added)).  So Touch-N-Buy's generic and vague allegations about "merchants," "agents,"

"vendors," or "parties" simply do not "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Touch-N-Buy's remaining set of allegations do specifically identify Brookes Bruno, an exclusive agent of Touch-N-Buy. But the allegations about UCFS's actions relating to Bruno are too vague to make out a claim. According to Touch-N-Buy, UCFS "tarnished and interfered with" Touch-N-Buy's relationship with Bruno, "caus[ing] ill will and animosity between the parties." (Compl., R. 1, PageID 8, ¶40). And because of this "breach," Touch-N-Buy's "agents no longer want[ed] to do business with [it] in" a certain field. (*Id.* at PageID 8, ¶41). These allegations, taken as true, tell us little about the complained-of actions. To start, a "vague assertion of interference"—like the complaint's assertion that UCFS tarnished and interfered with Touch-N-Buy's relationship with Brookes Bruno—is nothing more than "a 'legal conclusion' that is itself entitled to no weight." *Wilkey v. Hull*, 366 F. App'x 634, 638 (6th Cir. 2010) (citing *Iqbal*, 556 U.S. at 677–78). The same is true for its allegation that UCFS's conduct "caused ill will and animosity between the parties." (Compl., R. 1, PageID 8, ¶40). These allegations are too non-specific to glean any "improper act[s]" that "prevent[ed] formation of a contract, procur[ed] breach of a contract, or termination of a business relationship." *Grubb*, 119 N.E.3d at 842. So they do not "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and Touch-N-Buy's contention that allegations alerted UCFS to the "general nature of the disrupted relationships" is not enough, (Appellants' Reply Br., ECF 15, 7).

## C. Fraudulent Misrepresentation

Touch-N-Buy's complaint also falls short of the specificity necessary to satisfy Federal Rule of Civil Procedure 9(b) for its fraudulent misrepresentation claim.

To establish a fraudulent misrepresentation claim in Ohio, a plaintiff must show "(1) a material false misrepresentation; (2) knowingly made; (3) with intent of misleading another into relying on it; (4) reasonable reliance on the misrepresentation; and (5) injury resulting from the reliance." *Templeton v. Winner Enters., Ltd.*, 248 N.E.3d 791, 805–06 (Ohio Ct. App. 2024) (citation omitted).  But the pleading standard for fraud claims in federal court requires plaintiffs to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).[1]  In doing so, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614–15 (6th Cir. 2024) (citation modified).  This is the "who, what, when, where, and how of the alleged fraud." *Id.* at 614 (citation modified).  Consequently, "general allegations" about possible fraud "will not do"; the factual allegations must instead "convince us that the underlying fraud in all likelihood occurred." *Id.* at 615 (citation modified).

The complaint alleges that UCFS misrepresented "its intentions" to "carry out its obligations" and "the scope of [Touch-N-Buy's] work"; "fraudulently utilized [Touch-N-Buy's] resources" to "secure business for itself without" paying Touch-N-Buy; kept using Touch-N-Buy's "merchants and resources obtained from them"; and failed to pay Touch-N-Buy despite promises to do so that induced its procurement of business for UCFS.  (Compl., R. 1, PageID 9–10, ¶¶51–55).  Touch-N-Buy also directs us to several "specific assurances surrounding renegotiation and post-termination compensation" that it says support its fraud claim and satisfy Rule 9(b).  (Appellants' Br., ECF 11, 15; *see also* Resp. to MTD, R. 31, PageID 99–10).  These include things

[1] When sitting in diversity, we apply state substantive law and federal procedural law. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

like UCFS (1) promising to pay Touch-N-Buy so long as merchants it solicited entered new agreements with UCFS and (2) representing that it would renegotiate a new representative agreement.  UCFS also allegedly balked at referrals and failed to notify Touch-N-Buy when merchants it solicited spun off into new companies.  And UCFS allegedly withheld weekly reports, preventing Touch-N-Buy from assisting merchants, managing accounts, and meeting benchmarks.

Beyond all that, in paragraphs 32 through 37 of its complaint, Touch-N-Buy also described a purported scheme by UCFS to change its process for adding merchants so it could obtain merchant information to bypass Touch-N-Buy and avoid paying commissions.  And UCFS allegedly told Touch-N-Buy that it would be UCFS's only independent representative in new financing industries, prompting Touch-N-Buy to spend significant time and money promoting UCFS.

Yet, even accepting all these allegations as true, they do not meet the strictures of Rule 9(b).  To begin, the allegations provide no explanation of *why* UCFS's "assurances" were false.  *Greer*, 114 F.4th at 615.  For example, as the district court observed, even if UCFS promised Touch-N-Buy that it would be its only independent representative in the area, there are no allegations that UCFS hired other representatives to compete with Touch-N-Buy.  This, in turn, means Touch-N-Buy has not "specif[ied] the statements that [it] contends were fraudulent."  *Id.* at 614 (citation modified).  The identity of who made the allegedly fraudulent statements is also missing; Touch-N-Buy simply identifies these as assurances made by "Defendant," with no reference to a specific representative within UCFS.  *See id.* at 614–15 (requiring identification of the "speaker").  Nor does Touch-N-Buy "state where and when the statements were made."  *Id.* at 615 (citation modified).  Thus, its allegations do not comply with Rule 9(b)'s who-what-when-

where-how particularity requirements. And its additional substantive retorts do not address this central failing.

Procedurally, Touch-N-Buy insists that even if dismissal of its fraud claim was appropriate, the district court should have granted it leave to amend. But it is not for the district court to "initiate amendments." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 438 (6th Cir. 2008). So there is typically no abuse of discretion when a district court fails to "grant a party leave to amend where such leave is not sought." *Id.* (citation omitted). Here, Touch-N-Buy did not amend its complaint as of right after receiving the motion to dismiss or seek leave to amend it. *See* Fed. R. Civ. P. 15(a)(1), (2). Thus, the district court was under no obligation to "rescue[] [Touch-N-Buy] by *sua sponte* offering leave to amend the complaint." *Total Benefits*, 552 F.3d at 438.

## D. Accounting, Declaratory Judgment, Promissory Estoppel, and Unjust Enrichment

Finally, Touch-N-Buy argues that its promissory-estoppel and unjust-enrichment claims, and its request for an accounting, should have survived the motion to dismiss because they were pleaded in the alternative. And it says that its request for declaratory relief should have moved forward because that request hinged on its reading of Paragraph 14 (that commissions continue beyond termination). We disagree.

Parties may plead in the alternative. Fed. R. Civ. P. 8(d)(2), (3). But Ohio law precludes recovery on promissory-estoppel and unjust-enrichment claims when an express contract exists between the parties and covers the same subject. *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009); *see Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 858–59 (6th Cir. 2020) (unjust enrichment); *Right-Now Recycling, Inc. v. Ford Motor Credit Co., LLC*, 644 F. App'x 554, 558 (6th Cir. 2016) (promissory estoppel); *cf. Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*,

96 F.3d 174, 181–82 (6th Cir. 1996) (reinstating promissory-estoppel and unjust-enrichment claims where existence of contract conceded for summary-judgment purposes only but indicating re-dismissal would be "appropriate" if the defendant "admit[ted] to the existence of a valid contract").  Touch-N-Buy acknowledged as much below.  That is the case here.  The parties' valid contract, covering the same subjects, precludes Touch-N-Buy's promissory-estoppel and unjust-enrichment claims.  Similarly, Touch-N-Buy's request for declaratory relief is left rudderless without a viable breach-of-contract claim.

Last, in Ohio, a demand for an accounting is a remedy, "not [a] cause[] of action." *Moore Family Tr. v. Jeffers*, 225 N.E.3d 548, 559 (Ohio Ct. App. 2023) (citation omitted).  Here, only Touch-N-Buy's fraud claim could have given rise to an accounting. *Id.*  But because the district court properly dismissed all of Touch-N-Buy's claims—including the fraud claim—accounting is not an available remedy. *Id.*

**IV.**

For the foregoing reasons, we AFFIRM.